THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Jonathan Stern (*admitted pro hac vice*)
jstern@rosenlegal.com

*Attorneys for Lead Plaintiffs*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| IN RE: MICRON TECHNOLOGY, INC. SECURITIES LITIGATION | CASE NO. 1:25-cv-00191-BLW |
| THIS DOCUMENT RELATES TO: *All Actions.* | **AMENDED CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ....................1

II. JURISDICTION AND VENUE ....................6

III. PARTIES ....................6

IV. CONFIDENTIAL WITNESSES ....................8

V. SUBSTANTIVE ALLEGATIONS ....................8

A. Background of Micron ....................9

B. Background on the Memory Chip Manufacturing Process ....................13

C. Micron's Oversupply Woes Before the Class Period ....................16

D. Throughout the Class Period, Micron Makes Bullish Predictions about Increasing Demand and Decreasing Supply ....................20

E. Competitive Threat Posed by State Backed Chinese Enterprises ....................24

1. China's National Champion Strategy in the Semiconductor Industry ....................24

2. YMTC's Status and History as a National Champion ....................26

F. After Announcing Bullish Predictions, Mehrotra Begins Aggressively Liquidating Options and Selling Stock ....................28

G. Micron Announces a Surprise Decline in NAND Revenue and Disappointing Projections ....................32

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS ....................37

VII. THE TRUTH EMERGES ....................57

VIII. ADDITIONAL SCIENTER ALLEGATIONS ....................61

A. Additional Allegations in Support of Mehrotra's Scienter ....................62

B. Additional Allegations in Support of Murphy's Scienter ....................63

I. CLASS ACTION ALLEGATIONS ....................64

II. APPLICABILITY OF PRESUMPTION OF RELIANCE ....................66

III. NO SAFE HARBOR ....................68

COUNT I ....................68

Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants....68
COUNT II ....72
Violation of Section 20(a) of The Exchange Act Against The Individual Defendants....72
IX. PRAYER FOR RELIEF ....73

Lead Plaintiffs Morris Zelikovsky, Ronald Timms, and David A. Milman (collectively "Lead Plaintiffs") ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Micron Technology, Inc. ("Micron" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Micron common stock between March 29, 2023 and December 18, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. The crux of the alleged wrongdoing is that Micron—a memory chip manufacturer that for years had cultivated a reputation as the foremost forecaster of global supply and demand

dynamics within the semiconductor industry—suddenly began making optimistic pronouncements regarding those supply and demand dynamics at the same time that its CEO entered into a plan to sell massive amounts of stock. Only after the stock sales were completed did Micron reveal previously undisclosed supply and demand headwinds, including weaker than expected consumer and enterprise demand, and increased competition from Yangtsee Memory Technologies Corp ("YMTC"). Yet Defendants had previously assured investors that they had been closely tracking customer demand and were aware of the competitive threat from YMTC.

3. Micron designs, develops, manufactures, and sells memory and storage products, falling into two main categories, dynamic random access memory ("DRAM") and NAND flash memory ("NAND"). DRAM and NAND products are the two most common semiconductor chips readily available in the market.

4. Micron's memory and storage products are sold in various markets, with sales reported across multiple of its business units. These markets include those for consumer technologies such as personal computers ("PCs"), smartphones, tablets, cameras, and the like, as well as for commercial and industrial applications, such as in manufacturing environments and data centers. Examples of memory and storage products for consumers include, *inter alia*, NAND flash memory devices, such as solid-state drive ("SSD") cards and flash drives.

5. As Micron has noted in its regulatory filings, "[t]he memory and storage industry environment deteriorated sharply in the fourth quarter of 2022 and throughout 2023 due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce inventory levels[,]" which "led to significant reductions in average selling prices for both DRAM and NAND and bit shipments for DRAM, resulting in declines in revenue across all [of Micron's] business segments and nearly all [of its]

end markets." In an effort to prop up the Company's share price, however, throughout the Class Period Defendants repeatedly assured investors that demand for Micron's products, including its consumer-oriented and NAND products, was recovering and that supply was coming into line with industrywide demand, and assured investors that the Company was on track for record revenues in its fiscal year 2025. Micron also reassured investors that in making its statements about supply and demand, it had considered the competitive pressures it faced, including from state-backed Chinese competitors such as YMTC.

6. These assurances drove Micron's share price into the stratosphere. On March 28, 2023, the first day of the Class Period, Micron's share price was $59.28 per share. As a result of Defendants' misrepresentations, the Company's share price exploded to $153.45 on June 18, 2024, ***an increase of 158.9%***. Although the share price fell back over the ensuing months, on December 18, 2024, the day investors learned (after trading had closed) that Defendants had been misrepresenting Micron's business and prospects, the Company's share price closed at 103.90, up 75.3% from the start of the Class Period.

7. Throughout the Class Period, Defendants continued to make materially false and misleading statements regarding global supply and demand dynamics that failed disclose that its description of supply and demand ignored factors known or knowable to Micron, including weakness in customer demand and the competitive threat posed by YMTC, and that as a result, its description of the supply and demand environment was materially misleading.

8. With the shares of the Company pumped as a result of Defendants encouraging statements regarding customer demand, Defendant Mehrotra began the "dump" phase of his scheme and entered into a 10b5-1 trading plan that caused Mehrotra to sell 799,284 shares of stock for total proceeds of $77,471,537.52 *before* the promised record year of 2025. This

unprecedented selling spree was far out of character for Mehrotra. In the comparable timeframe preceding the Class Period, he only sold 100,000 shares for proceeds of $971,600. In other words, ***Mehrotra's Class Period sales eclipsed his prior history by more than 7,873.6%***.

9. After having reaped a windfall by selling inflated shares to unsuspecting investors, it was now time to come clean. On December 18, 2024, Micron issued a press release announcing its financial results for the first quarter of its fiscal year 2025.[1] Among other items, the Company reported a greater-than-expected revenue decline in NAND flash memory for the quarter. Micron also issued disappointing guidance for the second quarter of its fiscal year 2025, including adjusted earnings between $1.33 and $1.53 per share, well below the $1.92 per share estimate; sales between $7.7 billion and $8.1 billion, with the midpoint well below the $8.99 billion estimate; and adjusted gross margins between 37.5% and 39.5%, well below the 41.3% estimate; citing weakness in the Company's consumer-oriented markets. Defendants attributed these disappointing results to factors that were all known to Micron, including customer demand levels, and competition posed by YMTC.

10. The telltale signs of an unexpected downturn were absent from Micron's financial statements. Micron did not write down the value of inventory, its inventories did not increase, and the ratios it used to apprise investors of its inventory management status ***improved*** over the final months of the Class Period. This stood in stark contrast to what the Company experienced the last time it was surprised by a downturn, during its 2023 fiscal year, when Micron's inventory management ratios worsened dramatically, its inventories skyrocketed, and the Company was forced to write off $1.83 billion inventory. According to Arcady Zaydenverg, a forensic accounting expert retained by Plaintiffs, "Micron's inventory levels and ratios from the

---

[1] Micron's fiscal year typically ends in either August or September.

end of fiscal 2024 (*i.e.*, August 29, 2024) through the end of the first quarter of fiscal 2025 (*i.e.*, November 28, 2024), are not consistent with the expectation of a significant rise in revenue in the immediate future." In other words, the data shows that Micron was acting as if it was expecting a demand slowdown, not that it was surprised by a demand slowdown.

11. The next day, multiple analysts lowered their price targets for Micron stock, citing the Company's disappointing guidance for the second quarter of its fiscal year 2025, while noting significant weakness in demand in its consumer markets, especially for its NAND products. Following these developments, Micron's stock price fell $16.81 per share, or 16.18%, to close at $87.09 per share on December 19, 2024. This represented a stunning decline of ***43.2%*** from the Company's share price high of $153.45 on June 18, 2024.

12. The disclosures in the 1Q25 Earnings Release both corrected the market's misimpression Micron's business operations, which had been inflated by Defendants' misrepresentations, and constituted a materialization of the concealed risk that when the market learned the truth about the Company's prospects, the stock price would plummet.

13. While investors sustained massive losses as a result of this decline, Mehrotra reaped windfall profits by selling 799,284 shares of Micron stock during for proceeds of $77,471,537.52 during the class period, including 37,000 on June 11, 2024 for $5,141,890 in proceeds just before the Company's share price reached its peak, and ***another 34,284 shares on June 18, 2024, for $5,220,767.52 in proceeds as the stock peaked***.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

17. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and the Company is headquartered in this Judicial District.

18. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

19. Lead Plaintiff Morris Zelikovsky, as set forth in the previously filed Certification, purchased Micron securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

20. Lead Plaintiff Ronald Timms, as set forth in the previously filed Certification, purchased Micron securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

21. Lead Plaintiff David A. Milman, as set forth in the previously filed Certification, purchased Micron securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

22. Defendant Micron manufactures and sells memory and storage solutions worldwide. It offers memory and storage technologies, including Dynamic Random Access Memory ("DRAM"). The Company is incorporated in Delaware and its principal executive offices are located at 8000 South Federal Way, Boise, Idaho 83716. Micron's securities are traded on the NASDAQ under the ticker symbol "MU."

23. Defendant Sanjay Mehrotra ("Mehrotra") has served as the Company's Chief Executive Officer ("CEO"), President, and member of its Board of Directors (the "Board") since June 2017. Before that, he served as CEO of SanDisk from January 2011until its sale in May 2016,

24. Defendant Mark Murphy ("Murphy") has served as Micron's Executive Vice President and Chief Financial Officer at all relevant times. From June 2016 to April 2022, Mr. Murphy served as the Chief Financial Officer of Qorvo, Inc. Prior to Qorvo, Mr. Murphy served as Executive Vice President and Chief Financial Officer of Delphi Automotive PLC, and prior to Delphi, held executive roles at Praxair, Inc.

25. Defendants Mehrotra and Murphy are sometimes referred to herein as the "Individual Defendants."

26. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

27. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

28. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

29. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. CONFIDENTIAL WITNESSES

30. CW1 worked for Micron from 1992 through December 2023, when CW1 retired. CW1 started with Micron Technology in 1992, as a senior financial accountant. CW1's final position with the Company, held for approximately two years through December 2023, was Finance Director for Technology Development, reporting to Philip Doster, Micron's Operational Excellence Director. CW1 stated that, as finance director for technology development, he assisted with budgeting for the technological development organizations and monitored roadmaps.

## V. SUBSTANTIVE ALLEGATIONS

**A. Background of Micron**

31. Micron designs, develops, manufactures, and sells memory and storage products, including, *inter alia*, DRAM and NAND semiconductor devices, which are the two most common semiconductor chips readily available in the market. According to Micron's annual report on Form 10-K for the 2024 fiscal year ("FY2024"), the Company's fiscal year is "the 52 or 53-week period ending on the Thursday closest to August 31." Micron's FY2022, 2023, and 2024 each contained 52 weeks. Micron's FY2023 ended on August 31, 2023, and FY2024 ended on August 29, 2024. Micron develops, fabricates, assembles and tests its DRAM and NAND chips at its facilities in Taichung and Taoyuan, Taiwan; Singapore; Hiroshima, Japan; and Boise, ID, and Manassas, VA.

32. Micron's memory and storage products are sold in various markets, with sales reported across multiple of its business units, including the Computer and Networking Business Unit ("CNBU"), Storage Business Unit ("SBU"); Embedded Business Unit ("EBU"), and Mobile Business Unit ("MBU"). According to CW1, CNBU produces DRAM and high bandwidth memory for computers; SBU handles NAND flash memory; EBU produces embedded products for automotive; and MBU produces products for mobile phones.

33. Micron's DRAM products are a type of computer RAM, *i.e.*, semiconductor chips that store information while a computer is operating and provide that information quickly to a computer's CPU or GPU. DRAM chips are used solely for short-term storage because they use "volatile memory" Volatile memory refers to a computer storage that temporarily holds data this is in use and requires a continuous power supply to maintain its hold of that stored information;

if power is turned off or interrupted, the data stored in volatile memory is lost.[2] Micron's DRAM products are used in data center, personal computing, graphics, industrial, and automotive markets.

34. Conversely, NAND is a type of "flash memory." NAND is "non-volatile" memory in that it is a type of computer storage that retains data even when power is removed. Unlike DRAM chips, which use "volatile memory," NAND chips preserve information for long-term storage and retrieval.[3] NAND is used in solid state drives for data centers, client personal computing, consumer, automotive, and removable storage markets.

35. According to TrendForce's Department of Semiconductor Research, which is generally recognized as the industry's leading source of information on the semiconductor market and market participants, Micron's top competitors for DRAM semiconductors during the Class Period were Samsung, SK Hynix, and Nanya, and its top competitors for NAND semiconductors during the Class Period were Samsung, SK Group, Kioxia, and Western Digital.

36. Micron derives significant revenues from NAND and DRAM sales, which comprised 97.7% of the Company's revenues in FY 2023 and 98.9% of its revenues in FY2024. These revenues consisted of with $4.21 billion in NAND sales in FY2023 and $7.23 billion in NAND sales in FY 2024. Micron had $10.98 billion in DRAM sales in FY 2023 and $17.60 billion in DRAM sales in FY2024. Micron's NAND sales were 27.1% of its total revenues in

---

[2] *What is Volatile Memory?*, Lenovo.com, https://www.lenovo.com/us/en/glossary/volatile-memory/?orgRef=https%253A%252F%252Fwww.google.com%252F (last visited May 22, 2025).

[3] What is Non-Volatile Memory, Lenovo.com, https://www.lenovo.com/us/en/glossary/non-volatile-memory/?orgRef=https%253A%252F%252Fwww.google.com%252F&srsltid=AfmBOoqag32d9igtAtsBqXjTBxQTmjzerj9jvS4y4aURSm60weuI8k0y (last visited May 23, 2025).

FY2023 and 28.8% of its revenues in FY 2024. The Company's DRAM sales were 70.6% of its revenues in FY2023 and 70.1% of its revenues in FY2024.

37. In addition to reporting revenues, Micron also apprises investors of its inventory in multiple ways. Inventories are a key indicator of the Company's health because, as described below, the lead times for production of NAND and DRAM chips are very long. Micron thus runs a risk of not having sufficient inventory to meet demand or, worse, being caught exposed by an unanticipated decline in demand. One such decline, in calendar year 2022, resulted in the Company's writing off $1.83 billion in inventory in its fiscal year 2023. To allow investors to assess how well it manages its inventory, Micron reports its cost of goods sold, as well as the dollar value of its inventory ("raw materials," "work in progress," and "finished goods"). This information enables investors to evaluate how well Micron manages its inventory by calculating "inventory turnover ratio"; and "days in inventory" ratio, the two most commonly used inventory ratios.

38. The inventory turnover ratio measures how often a company sells and replaces its inventory over a specific period. It is a key metric in understanding inventory management because it measures how efficiently a company converts its inventory into revenue. The ratio is calculated by dividing a company's "cost of goods sold" by its "average inventory." A lower or a declining inventory ratio 2.5x, can be a sign of weak sales or excessive inventory, *i.e.*, overstocking. A higher or increasing inventory turnover ratio, on the other hand, can reflect strong sales or insufficient inventory. This ratio is often calculated on a per quarter and annualized basis.

39. The "days in inventory" ratio is the average number of days it takes for a company to sell off its inventory. Like the inventory turnover ratio, days in inventory is used to

determine a company's inventory management and overall efficiency. By calculating the number of days that a company holds onto the inventory before it is able to sell it, the ratio measures the average length of time that a company's cash is locked up in its inventory. Days in inventory is calculated by taking the average inventory, dividing it by costs of goods sold, and multiplying it by a number of days, *e.g.*, 365 days if calculating days in inventory on an annualized basis. A smaller number of days in inventory indicates that a company is more efficiently and frequently selling off its inventory, which means rapid turnover leading to potentially higher profits. A high number of days in inventory can indicate that a company is not properly managing its inventory or is having trouble selling that inventory. This ratio is often calculated on a per quarter and annualized basis.

40. According to CW1, Micron's "quarterly forecast" and "budgeting" was "extremally detailed." CW1 stated that Micron executives "were constantly tracking as they moved through the quarter [to see] if there were materially significant changes." CW1 stated that the Company uses an accelerated SAP system ("ASAP") for their Enterprise Resource Planning (ERP), uses "Workday" software for forecasting, and a "Power BI" dashboard for performance and plan reporting. "The business units know what big customers are ordering," CW1 said, and "they have close communication with key customers."

41. CW1 further stated that if there were any declines in sales it would trigger a "frenzy" at Micron. CW1 stated that "[t]here are so many people looking at [sales] . . . So many executive level meetings if sales revenue is not coming in on target." CW1 further stated that "People are meeting multiple times a week to discuss it." According to CW1, these executive-level meetings will consist of upper management, the heads of business units, and the head of sales. CW1 said that in connection with these meetings, "there is lots of data being pulled . . . .

They are looking at what levers can be adjusted to meet the targets. They're looking at manufacturing deliverables. Are they hitting outputs?"

42. CW1 further stated that Micron uses a "Flash Report" to keep track of its quarterly goals. The Flash Report was created and maintained by the "Financial Planning & Analysis" or "FP&A" group. It begins at the start of each quarter, which lasts 13 weeks, and its starting point is the Company's forecast, which was extremely detailed. The report is updated weekly, and generated every Friday, to track Micron's progress on meeting its goals. CW1 stated that "you're four weeks in and you didn't [meet your goals] in the first four weeks, the flash (report) would include actuals and then an updated forecast for the next nine weeks." CW1 further stated that "In addition to the sales side, (there would be) very high-level updates coming from manufacturing. If some process problem that would impact revenue, or if there was some significant expense." The reports also detailed forecasts, sales and performance of NAND and DRAM products specifically.

43. CW1 further stated that "everyone sees the Flash Report," including high level executives. According to CW1, the Flash Report is specifically for the CFO, *i.e.*, Murphy, but that report and its weekly updates goes to the Company's executive group and financial planning and analysis group. CW1 stated that the Flash Report would reveal if the Company was falling short of sales goals.

**B. Background on the Memory Chip Manufacturing Process**

44. Memory chips, including DRAM and NAND chips—Micron's primary products—are among the most complex manufactured products in the world and require extensive production time and precise manufacturing conditions. This lengthy manufacturing process creates significant lead times between production decisions and market availability,

which is critical context for understanding Micron's statements about market demand and recovery.

45. The memory chip manufacturing process consists of several distinct phases. First, ultra-pure silicon wafers are prepared as the foundation for chip creation, where wafers are "sliced from a salami-shaped bar of 99.99% pure silicon" and "polished to extreme smoothness."[4] Next comes the photoresistant coating. During the next step, photolithography, patterns are transferred onto the wafer using a similar technology to developing photographs, followed by etching to remove material according to these patterns, creating the circuitry that will form the memory cells. For memory chips, this process is repeated dozens of times to create the complex three-dimensional structures needed for data storage. Next, the wafer is bombarded with positive or negative ions to tune the electrical conducting properties of the chip. The final step is the cutting of individual chips from the wafer (dicing), after which chips are assembled and mounted onto packages, connected with external pins, and undergo final testing before delivery.

46. Manufacturing a finished memory chip for a customer typically takes up to 26 weeks (approximately 6 months) from order to delivery, according to a report by the Semiconductor Industry Association dated February 26, 2021.[5] The fabrication process alone requires about 12 weeks on average for standard processes, but can extend to 14-20 weeks for

---

[4] Alison Li, *6 crucial steps in semiconductor manufacturing*, ASML.com, Oct. 4, 2023, https://www.asml.com/en/news/stories/2021/semiconductor-manufacturing-process-steps

[5] Semiconductor Industry Association, *Chipmakers Are Ramping Up Production to Address Semiconductor Shortage. Here's Why that Takes Time*, Semiconductors.org, Feb. 26, 2021, https://www.semiconductors.org/chipmakers-are-ramping-up-production-to-address-semiconductor-shortage-heres-why-that-takes-time/.

advanced technologies. After the main fabrication is complete, chips must undergo additional backend assembly, testing, and packaging, which adds another 6 weeks to the timeline.

47. The manufacturing process involves extraordinary complexity. Producing a single semiconductor wafer can involve "up to 1,400 process steps" using highly sophisticated equipment. [6] For memory chips specifically, this includes multiple rounds of photolithography, deposition, etching, and testing under pristine clean room conditions.

48. This extended production cycle means that memory manufacturers like Micron must make production decisions months in advance of anticipated market demand. Adjusting production capacity is not a rapid process—the semiconductor industry has noted that increasing capacity utilization "is not as easy as 'flipping a switch' and increasing chip output overnight" as the Semiconductor Industry Association ("SIA") put it.[7]

49. Indeed, according to the SIA, "[w]hen market demand runs high…front-end semiconductor fabrication facilities, or fabs, will typically run above 80 percent capacity utilization, with some individual fabs running as high as between 90-100 percent."[8]

50. Micron acknowledges these long lead times for its products in its SEC filings. For example, in its annual report on Form 10-K for FY2024, ("FY24 10K") which was filed with the SEC on October 4, 2024, Micron advised investors that "some of our components have long lead-times, requiring us to place orders up to a year in advance of anticipated demand. Such long lead-times increase the risk of excess inventory or loss of sales in the event our forecasts vary substantially from actual demand." The FY24 10K further advised that "[b]ecause of the lead

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

times necessary to manufacture our products, we typically begin to process wafers before completion of performance and reliability testing."

51. Accordingly, when manufacturers like Micron make statements about market recovery, these statements impact production decisions that will affect product availability and pricing multiple quarters later.

### C. Micron's Oversupply Woes Before the Class Period

52. Beginning in the fourth quarter of 2022, Micron's revenues began a steep decline due to a weakening market for memory products. As the Company described in its quarterly report on Form 10-Q for the third quarter of FY2023 ("3Q2023 10-Q"), which was filed on June 29, 2023, "[t]he memory and storage industry environment deteriorated sharply in the fourth quarter of 2022 and throughout 2023 due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce inventory levels[,]" which "led to significant reductions in average selling prices for both DRAM and NAND and bit shipments for DRAM, resulting in declines in revenue across all [of Micron's] business segments and nearly all [of its] end markets."

53. In the fourth fiscal quarter of 2022, according to an 8-K filed September 29, 2022, Micron's revenue fell from $6.643 billion, down from $8.642 billion in the prior quarter, and $8.274 billion the fourth quarter of 2021. Revenue continued to slide in FY 2023, falling to $4.085 billion in the first quarter, $3.693 billion in the second quarter, and $3.752 billion in the third quarter of 2023.

54. Micron's financial situation was made substantially worse by the fact that while Micron's revenues declined, its cost of goods sold remained flat, leading Micron's gross profits to turn negative—meaning that Micron not only began running losses in fiscal 2023, but it lost

money on each unit it sold, even before taking into account R&D, sales, and administrative expenses, as shown in the below chart.




55. This sudden slowdown in demand led Micron's inventories to increase from $6.6 billion in the end of fiscal 2022 to $8.4 billion at the end of Q1 2023. This weak demand led Micron to write down $1.43 billion in existing inventory in the second quarter of 2023, and a total of $1.83 billion in inventory in the last nine months of FY2023 (i.e., November 2022 to August 2023) overall.

56. The sudden slowdown in demand was also reflected when using the Company's data to calculate other inventory measures. As reflected in the chart below,[9] Micron's inventory turnover, *i.e.*, its ability to sell inventory plummeted from 3.02x to 2.42x, and its days in inventory rose 25%, from 120 days to 150.6 days.

[9] The chart header "TTM Inventory Ratios" refers to the fact that the data displayed is annualized, *i.e.*, the "trailing twelve month total."




57. Plaintiffs retained an expert, Arcady Zaydenverg, to analyze Micron's increase inventory and movement in inventory turnover and days in inventory ratios in the fourth quarter of fiscal year 2022 and, as described further below, at the end of the Class Period (*i.e.*, the first quarter of fiscal year 2025).

58. Mr. Zaydenverg is a Certified Public Accountant ("CPA") licensed in New York and a Certified Fraud Examiner ("CFE") with almost thirty years of experience in public and private accounting. He has worked as an external and internal accountant with a broad array of companies, including manufacturers, distributors, and service providers in various industries. He specializes in providing forensic accounting and litigation advisory services, which often includes, among other things, analyzing financial statements, performing financial modeling, analyzing the application of accounting and auditing standards, fraud investigations, and calculating commercial damages. Mr. Zaydenverg analyzed Micron's SEC filings from the fourth quarter of fiscal year 2021 (*i.e.*, the end of May 2021) to the second quarter of fiscal year 2025 (*i.e.*, the end of February 2025). Mr. Zaydenverg concluded that the movement in inventory

amounts and inventory turnover and days in inventory ratios were not consistent with Micron experiencing an unexpected decline in demand.

59. Another telltale sign that Micron had overestimated demand was that it reduced wafer starts in 2023 and recognized costs from underutilization of its facilities, taking an underutilization cost in the second quarter of 2023 of $27 million, a $132 million cost in the third quarter, a $222 million cost in the fourth quarter, and a $165 underutilization cost in the first quarter of 2024.

60. While this sudden drop off in demand was painful for Micron, it did have a silver lining—by promptly announcing the drop off in demand, Micron bolstered its reputation as a knowledgeable and forthright predictor of market conditions in the memory market. CNBC noted, in a July 1, 2022 article, that the previous day, "Mehrotra said on an earnings call with analysts that he expected smartphone unit volume to decline by around 5% versus last year. Analysts were expecting growth around 5%, Micron said. The company also warned that it believed that PC sales could decline 10% versus last year and that it was making changes to its production growth to match weaker demand." The article noted that "Micron supplies memory to smartphone makers including Apple, Motorola, and Asus, so it has a view into broader sales trends."

61. Part of Micron's insight into supply and demand came from its long-term agreements ("LTAs") with its customers. As Defendant Mehrotra stated on a June 27, 2023 earnings call "our customers … work with us on LTAs. And as we have said, LTAs relate to their forecast for the year, generally. And while some customers may be operating on shorter term or other customers longer term, but generally speaking, they operate on yearly LTAs and LTAs involve supply and demand commitments from the two sides."

### D. Throughout the Class Period, Micron Makes Bullish Predictions about Increasing Demand and Decreasing Supply

62. On March 28, 2023, Micron suddenly reversed course on its warnings. During the Company's Q2 2023 earnings call with analysts and investors, after markets closed, Mehrotra announced that "customer inventories have reduced in several end markets, and we see gradually improving supply-demand balance in the months ahead. Excluding the impact of inventory write-downs, we believe our balance sheet DIO [Days Inventory Outstanding] has peaked in fiscal Q2, and we are close to our transition to sequential revenue growth in our quarterly results." Mehrotra boldly predicted that "[w]hile our industry faces significant near-term challenges, we believe that the memory and storage TAM [Total Addressable Market] will grow to a new record in calendar 2025 and will continue to outpace the growth of the semiconductor industry thereafter." The following day, when trading resumed, Micron's shares shot up $4.04 per share, or 6.7%, on more than double the usual trading volume.

63. Mehrotra's confident prediction about the timing of recovery stood in stark contrast to industrywide predictions. For example, on March 28,2023, the same day that Micron announced its earnings, TrendForce predicted declining sales prices for DRAM in an article entitled, "Decline in DRAM ASP Narrows to 10~15% in 2Q23 with No End in Sight, Says TrendForce."[10] Likewise, SK Kim of Daiwa Capital Markets told CNN on April 27, 2023, that

---

[10] Press Release, *Decline in DRAM ASP Narrows to 10~15% in 2Q23 with No End in Sight, Says TrendForce*, TrendForce, Mar. 28, 2023, https://www.trendforce.com/presscenter/news/20230328-11626.html.

the market is facing a deep downturn, and that there will probably be a gradual recovery rather than a sharp rebound.[11]

64. Mehrotra continued the optimistic tone in the following quarter, boasting that "[t]he ongoing improvement of customer inventories and memory content growth are driving higher industry demand, while production cuts across the industry continue to help reduce excess supply. As a result, pricing trends are improving, and we have increased confidence that the industry has passed the bottom for both quarterly revenue and year-on-year revenue growth." Mehrotra went on to boast that "[b]eyond this downturn, we expect to see record TAM in calendar 2025 along with a return to more normalized levels of profitability."

65. Mehrotra continued to trumpet the decline in supply in the following quarter, boasting that "in 2023, the industry has experienced extreme over supply and you know extreme negative effect on the profitability as well. And you see now that CapEx [capital expenditure] cuts and underutilization in the fab have been implemented across the industry given the CapEx constraints that we have, as well as given the poor profitability and certainly Micron has done that, but this is happening across the industry as well." Similarly in December, Mehrotra touted "significant supply reductions across the industry have enabled the recovery that is now underway", going on to state in March 2024 that the company "expect[s] calendar 2024 industry supply to be below demand for both DRAM and NAND" and in June 2024 that "Micron drove robust price increases as industry supply-demand conditions continued to improve". In September 2024, Mehrotra went on to boast that "[g]iven the significant reduction in the industry

---

[11] Squawk Box Asia, *The Memory Chip Market is Facing a 'Deep Downturn,' Analyst Says*, CNBC.com, Apr. 27, 2023, https://www.cnbc.com/video/2023/04/27/the-memory-chip-market-is-facing-a-deep-downturn-analyst-says-.html

wafer capacity in NAND and the ongoing low NAND capex environment, we also expect a healthy industry supply demand environment for NAND in calendar 2025."

66. This optimism was also inconsistent with what Micron's competitors were telling customers. For example, in a call with investors to report its results for the third quarter of calendar year 2023, Hynix told investors, "[r]ecovery from [DRAM] production cut will be gradual, in line with inventory level and market conditions," and "given that NAND's inventory is higher than DRAM's, conservative production will be maintained for NAND for the time being." Hynix further stated that "This will help turn around overall production growth in the DRAM and NAND industry to a positive growth next year, but only by a single digit." As to NAND, Hynix stated that "We have particularly seen [NAND] demand growth fall short of expectations over the past two years despite a sharp decline in prices, but supply growth had continued leading to a sharp rise in inventory level and worsening profitability, prompting all companies to begin cutting production."

67. The following quarter, *i.e.*, the fourth quarter of calendar year 2023, Hynix was again careful to manage expectations about future demand for NAND, stating on a call with analysts and investors that "overall production growth will be constrained as focus moves toward high-demand premium products requiring advanced processes while production of legacy products continues to decline. Therefore, despite the recovery in utilization, we estimate industry production growth to be within the single-digit range, mainly caused by the buy-side penalty impact in shifting production to value-added products." Later in the call, Hynix added, "For NAND, where recovery is more gradual, we focused on improving efficiency through production cuts of low-margin products and inventory reduction."

68. Likewise, the following spring, on March 5, 2024, Western Digital's CEO, David Goeckeler, when asked, "what's the general tenor of supply-demand for NAND," told attendees at a conference that "supply demand is coming back into balance. We're not all the way there yet….if you look at what's going on now in the business, this quarter, bits will be down sequentially. Going into F Q4, we expect bits to be flat. So any change in the business in NAND is going to be all pricing driven." When asked about NAND capital expenditures Goeckeler continued, "we're still looking at a significant decline relative to last year. For the fiscal '24,basically, we still see a much lower -- significantly lower CapEx spend relative to fiscal '23." Goeckeler continued, "we've been getting this question a lot, especially in the drive business as demand starts to return, how fast can we add capacity back, and that's really not our focus. I mean, our focus is getting to supply-demand balance. I mean, clearly, in NAND, we've got a way to go to until we get there."

69. In July 2024, on an earnings call with analysts and investors to report Samsung's financial performance for the second quarter of calendar 2024, Samsung Executive Vice President Jaejune Kim was asked about the outlook for DRAM and NAND in the third quarter of calendar 2024. Kim expressed caution, telling analysts and investors, "we expect third quarter bit growth in DRAM and NAND to record low single-digit level. Also, considering the overall business cycle and market conditions, this is expected to be largely similar to the broad market levels."

70. Later that month, on Hynix's earnings call for the second quarter of calendar 2024, Woo-Hyun Kim, Hynix's vice president and head of finance advised investors, "Third quarter DRAM bid shipment is expected to grow by low single digit percent sequentially, driven by further expansion of our HBM sales volume where strong demand is evident. NAND bid

shipment is expected to decrease by mid-single-digit percent sequentially, despite increase in eSSD sales volume, given yet soft end demand in conventional applications and relatively high customer's inventory." Later in the call, a Hynix representative advised, "So with the exception of enterprise SSDs where demand for NAND is clearly growing, general applications such as PC and mobile demand is still showing a modest recovery and we are responding to market conditions by maintaining our strategy of optimizing investments and improving profitability."

71. The following October, on an earnings call with analysts and investors to report Samsung's financial performance for the third quarter of calendar 2024, Kim was asked about the outlook for DRAM and NAND in the fourth quarter of calendar 2024. Kim continued to be cautious, telling attendees, "on the weaker mobile demand, we expect demand growth to be constrained. And this, when combined with the base effect from low bit shipments in the third quarter, overall NAND bit shipment is expected to see limited growth at around the low single digit level."

### E. Competitive Threat Posed by State Backed Chinese Enterprises

#### 1. China's National Champion Strategy in the Semiconductor Industry

72. The concept of "national champions" is a cornerstone of China's industrial policy, particularly in strategic sectors like semiconductors. Following the reform and opening up period that began in 1978, China has consistently invested in developing domestic semiconductor capabilities, but this strategy gained significant momentum and formalization with the establishment of the National Integrated Circuit Industry Investment Fund (commonly known as the "Big Fund") in 2014. This fund, which initially raised approximately $21 billion, was designed to support China's ambitions to reduce dependency on foreign technology and develop

indigenous semiconductor capabilities, according to the Center for Strategic and International Studies ("CSIS").[12]

73. China's strategic focus on semiconductors became even more pronounced following the April 2018 US sanctions against Chinese telecommunications giant ZTE, which highlighted China's vulnerability to foreign technology restrictions. As noted by CSIS, this incident marked a decisive turning point in China's semiconductor strategy, shifting the focus from purely economic considerations to viewing the industry primarily through a national security lens.[13] The Chinese government subsequently increased subsidies to prioritize domestic semiconductor capacity and reduce dependence on foreign technologies, especially from the US.

74. In 2015, China formally launched the "Made in China 2025" strategic plan, which explicitly identified semiconductors as one of ten key sectors for development. According to McKinsey, the Chinese government adopted a distinctive approach in this plan: "There is a greater focus on creating segment winners, or national champions, through M&A and other government-supported activities."[14] This strategy aimed to concentrate resources on selected companies that could eventually compete globally with established industry leaders.

75. With the release of China's 14th Five-Year Plan and statements from the 20th Party Congress, the emphasis on semiconductor self-sufficiency has been further elevated, with

---

[12] Gregory Allen, *China's New Strategy for Waging the Microchip Tech War*, CSIS.org, May 3, 2023, https://www.csis.org/analysis/chinas-new-strategy-waging-microchip-tech-war.

[13] Id.

[14] Christopher Thomas, *A New World Under Construction: China and Semiconductors, McKinsey.com*, Nov. 1, 2015, https://www.mckinsey.com/featured-insights/asia-pacific/a-new-world-under-construction-china-and-semiconductors

"science and technology self-reliance" and "secure and controllable supply chains" becoming central policy objectives, according to the UC Institute on Global Conflict and Cooperation.[15]

### 2. YMTC's Status and History as a National Champion

76. Yangtze Memory Technologies Co. (YMTC) was founded in Wuhan, China, in July 2016 as a direct implementation of China's national champion strategy in the memory chip sector. As described in a letter from U.S. Congressman Michael McCaul and Senator Bill Hagerty to the Commerce Secretary, "YMTC is the PRC's state-owned national champion for memory chips — a type of semiconductor with defense, artificial Micronligence, and aerospace applications."[16]

77. The state's commitment to YMTC as a national champion, and its specific purpose of reducing Micron and its competitors' respective footprints, has been well documented. For example, in June 2022, Nikkei Asia reported that the company was planning to "bring online a second plant in its home city of Wuhan as early as the end of 2022" to "close the company's technology and output gap with global leaders such as Samsung of South Korea and Micron Technology of the US." The article further reported that YMTC's growth "put it on the world's semiconductor map and delivered a notable success in Beijing's attempt to reduce China's reliance on imported chips." Indeed, YMTC specialized in NAND memory, and the new plant was designed to be able to shift to "more cutting edge chips" manufactured by Micron,

---

[15] Jimmy Goodrich, *China's Evolving Semiconductor Strategy*, May 29, 2024, IGCC, https://ucigcc.org/blog/chinas-evolving-semiconductor-strategy/.

[16] Simon Lester, *National Security and International Competition in Semiconductors: YMTC and the Commerce Department's Entity List*, China Trade Monitor, Jul. 13, 2021, https://www.chinatrademonitor.com/national-security-and-international-competition-in-semiconductors/.

Samsung, and SK Hynix.[17] The plant was hoping to get the ability to manufacture these chips by 2024. The plant would also get YMTC to expand its market share to more than 10% globally, *i.e.*, approximately Micron's share of the market. In fact, to avoid sanctions, YMTC was reportedly, "maintain[ing] good relationships with US and other foreign vendors to ensure its expansion plans come to fruition."

78. YMTC has also benefitted from continued state financial support, particularly in response to external challenges. As reported in the Nikkei Asia article described above, YTMC is backed by the China Integrated Circuit Industry Investment Fund, "Beijing's most important chip investment funding vehicle." In March 2023, following US trade restrictions, YMTC received a massive capital injection of US$7 billion from state-backed investors, including the second phase of the China Integrated Circuit Industry Investment Fund. This funding was widely interpreted as Beijing "doubling down on its efforts to shore up domestic chip production amid growing tensions with the US."[18]

79. By 2021, YMTC attained a 5% market share in NAND memory, according to an August 5, 2022 article in the South China Morning Post.[19]

80. According to The Register, by November 2023, YMTC had already utilized the $7 billion in capital received earlier that year "on replacing equipment and the development of

---

[17] Cheng Ting-Fang, *China's Yangtze Memory Takes On Rivals With New Chip Plant*, Nikkei Asia, Jun. 26, 2022.

[18] Ann Cao, *Tech war: China's top memory chip maker YMTC gets US$7 billion from state-backed investors*, South China Morning Post, Mar. 2, 2023, https://www.scmp.com/tech/tech-war/article/3212118/tech-war-chinas-top-memory-chip-maker-ymtc-gets-us7-billion-state-backed-investors.

[19] *Tech war: China's memory chip champion YMTC stays mum amid threat of US sanctions*, South China Morning Post, Aug. 5, 2022, https://finance.yahoo.com/news/tech-war-chinas-memory-chip-093000273.html.

new components and chipmaking tools, following the company being placed on US blacklists last year that barred it from buying American-made chip design and manufacturing kit."[20]

81. All of this was known to Defendants throughout the class period. Indeed, Micron repeatedly told investors that "we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities, in companies such as Yangtze Memory Technologies Co., Ltd. ("YMTC") and ChangXin Memory Technologies, Inc. ("CXMT")." These statements assured investors that Defendants were aware of YMTC's status as a competitive threat and that Defendants were taking that threat into account when repeatedly and publicly speaking about global supply and demand conditions in the memory chip sector.

### F. After Announcing Bullish Predictions, Mehrotra Begins Aggressively Liquidating Options and Selling Stock

82. Prior to the Class Period, Mehrotra had only sold Micron stock on a single occasion, selling 100,000 shares of stock on January 14, 2022 for total proceeds of $971,600.

83. At the start of the Class Period, Mehrotra held 1,383,566 shares of Micron stock. On May 15, 2023, after he began touting Micron's strong prospects in 2024 and 2025, Mehrotra adopted a 10b5-1 plan to automatically, and aggressively, liquidate Mehrotra's holdings in Micron beginning in August 2023 and continuing throughout the class period. In total, Mehrotra converted options for 799,284 shares of common stock and sold those shares for total proceeds

[20] Dan Robinson, *China's YMTC scrounges for billions to help bypass US sanctions*, The Register, Nov. 2, 2023, https://www.theregister.com/2023/11/02/chip_wars_hit_ymtc/.

of $77,471,537.52. Mehrotra's decision to begin selling shares at this time seemed peculiar, as TrendForce had just predicted that Micron's operating margins would "remain in the red."[21]

84. The below chart lists all of Mehrotra's sales.

| Date | Sale Price | Quantity | Proceeds |
|---|---|---|---|
| **8/14/2023** | $67.24 | 37,000 | $2,487,880.00 |
| **8/22/2023** | $63.93 | 7,000 | $447,510.00 |
| **8/29/2023** | $69.29 | 37,000 | $2,563,730.00 |
| **9/6/2023** | $70.11 | 7,000 | $490,770.00 |
| **9/12/2023** | $71.15 | 7,000 | $498,050.00 |
| **9/19/2023** | $70.39 | 7,000 | $492,730.00 |
| **9/26/2023** | $68.30 | 7,000 | $478,100.00 |
| **10/3/2023** | $68.19 | 7,000 | $477,330.00 |
| **10/10/2023** | $69.54 | 7,000 | $486,780.00 |
| **10/17/2023** | $69.00 | 7,000 | $483,000.00 |
| **10/24/2023** | $67.54 | 7,000 | $472,780.00 |
| **10/31/2023** | $66.13 | 7,000 | $462,910.00 |
| **11/7/2023** | $72.66 | 7,000 | $508,620.00 |
| **11/14/2023** | $76.94 | 22,000 | $1,692,680.00 |
| **11/21/2023** | $76.73 | 7,000 | $537,110.00 |
| **11/28/2023** | $75.07 | 7,000 | $525,490.00 |
| **12/5/2023** | $73.55 | 7,000 | $514,850.00 |
| **12/12/2023** | $79.88 | 134,000 | $10,703,920.00 |
| **12/19/2023** | $81.61 | 7,000 | $571,270.00 |
| **12/27/2023** | $86.52 | 7,000 | $605,640.00 |
| **1/3/2024** | $82.13 | 7,000 | $574,910.00 |
| **1/9/2024** | $83.63 | 7,000 | $585,410.00 |
| **1/17/2024** | $83.20 | 7,000 | $582,400.00 |
| **1/23/2024** | $87.41 | 7,000 | $611,870.00 |
| **1/25/2024** | $90.00 | 45,000 | $4,050,000.00 |
| **1/30/2024** | $87.02 | 7,000 | $609,140.00 |
| **2/6/2024** | $84.84 | 7,000 | $593,880.00 |

[21] Press Release, *DRAM Industry Q1 Revenues Decline 21.2% QoQ, Marking Third Consecutive Quarter of Downturn, Says TrendForce*, TrendForce, May 25, 2023, https://www.trendforce.com/presscenter/news/20230525-11688.html

| | | | |
|---|---|---|---|
| **2/13/2024** | $82.03 | 7,000 | $574,210.00 |
| **2/21/2024** | $80.44 | 7,000 | $563,080.00 |
| **2/27/2024** | $91.54 | 7,000 | $640,780.00 |
| **3/5/2024** | $94.26 | 7,000 | $659,820.00 |
| **3/8/2024** | $99.41 | 52,000 | $5,169,320.00 |
| **3/19/2024** | $110.65 | 52,000 | $5,753,800.00 |
| **3/25/2024** | $119.99 | 52,000 | $6,239,480.00 |
| **4/2/2024** | $128.94 | 52,000 | $6,704,880.00 |
| **4/9/2024** | $122.60 | 7,000 | $858,200.00 |
| **4/16/2024** | $120.70 | 7,000 | $844,900.00 |
| **4/23/2024** | $111.93 | 7,000 | $783,510.00 |
| **4/30/2024** | $114.87 | 7,000 | $804,090.00 |
| **5/7/2024** | $120.32 | 7,000 | $842,240.00 |
| **5/14/2024** | $122.89 | 7,000 | $860,230.00 |
| **5/21/2024** | $127.66 | 7,000 | $893,620.00 |
| **5/29/2024** | $132.14 | 7,000 | $924,980.00 |
| **6/4/2024** | $126.14 | 7,000 | $882,980.00 |
| **6/11/2024** | $138.97 | 37,000 | $5,141,890.00 |
| **6/18/2024** | $152.28 | 34,284 | $5,220,767.52 |
| **Total** | | 799,284 | $77,471,537.52 |

85. Indeed, as the chart below shows, Mehrotra increased his share sales as the Company's share price became inflated by his misstatements. In fact, Mehrotra made several of his largest sales—totaling 279,284 shares (or 17% of his total holdings)—as the stock was at or near its peak.

**MEHROTRA TIMES MASSIVE SHARE SALES**
**TO CAPITALIZE ON INFLATED SHARE PRICE**




86. Tellingly, despite the fact that Mehrotra repeatedly touted 2025 as a record year for Micron and the semiconductor industry as a whole, according to form 4s filed during the Class Period, Mehrotra sold his shares immediately upon exercise pursuant to the instructions in his 10b5-1 trading plan. This indicates that Mehrotra structured his 10b5-1 plan to liquidate all his shares be liquidated in 2024 immediately upon option exercise, *i.e.*, to sell as much as

possible while the share price was inflated. Indeed, since the end of the Class Period, after the truth emerged and investors learned the truth, Mehrotra has made a single trade of 7,500 shares for $784,986 in February 2025.

87. According to Micron's proxy statement filed December 2, 2022, as of November 14, 2022, Mehrotra owned 1,184,119 shares of common stock and the right to acquire 612,284 additional shares through exercise of option for a total beneficial ownership of 1,796,403 shares of common stock. According to Micron's proxy statement filed November 26, 2024, as of November 28, 2024, Mehrotra owned 1,278,674, of which 271,679 were restricted and ineligible for sale, amounting to 1,006,995 shares eligible for sale. In all, Mehrotra reduced his unrestricted holdings in Micron stock and exercisable options during the class period by 43.9%.[22]

### G. Micron Announces a Surprise Decline in NAND Revenue and Disappointing Projections

88. On December 18, 2024, after the close of trading, Micron issued a press release announcing its financial results for the first quarter of its fiscal year 2025 (the "1Q25 Earnings Release"). At the same time, Micron issued its quarterly report for the first quarter of its fiscal year 2025 (the "1Q25 10Q"). Among other items, the Company stated that "Sales of NAND products decreased 5% primarily due to a low-single-digit percent range decrease in bit shipments and a low-single-digit percent range decrease in average selling prices," and issued disappointing guidance for the second quarter of its fiscal year 2025, including adjusted earnings between $1.33 and $1.53 per share, well below the $1.92 per share estimate; sales between $7.7 billion and $8.1 billion, with the midpoint well below the $8.99 billion estimate; and adjusted

[22] The lack of Form 4s filed between November 14, 2022 and the start of the class period, and between November 26, 2024 and the end of the Class Period indicates that the numbers represented in the two proxy statements reflects Mehrotra's holdings at the start and the end of the class period, respectively.

gross margins between 37.5% and 39.5%, well below the 41.3% estimate. In addition, Defendant Mehrotra, as quoted in the 1Q25 Earnings Release, disclosed that "consumer-oriented markets are weaker in the near term[.]" On an earnings call that same day, Mehrotra further attributed the disappointing results to "slower growth in NAND content in consumer devices, ongoing inventory adjustments and demand dynamics in different end markets, as outlined earlier, and a temporary moderation in near-term data center SSD purchases by customers after several quarters of very rapid growth." Mehrotra also stated that "[c]onsistent with analyst reports, we have seen an increase in bit supply at legacy technology nodes from a China-based DRAM and a China-based NAND supplier. In calendar 2024, analyst reports indicate that China-based supply will represent a mid-single-digit percentage of industry bit supply for DRAM and a high-single-digit percent of supply for NAND."

89. Yet, despite the fact that Defendants claimed that the weakness of demand and excess of supply in the NAND market was a surprise to investors, Micron's financial results showed none of the tell-tale signs of a shock to the market. For example, Micron did not need to write down any inventories because of lower prices. In addition, Mehrotra's comments revealed that, in assessing supply in the NAND market, Mehrotra did not take into account the "China-based NAND supplier"—YMTC—despite the fact that it was well known to Micron for years that YMTC had a significant market share and financial backing from the Chinese government and was ramping up production throughout the class period.

90. In addition, given the extensive lead time to develop DRAM and NAND semiconductors, Micron needed to increase its inventories of raw materials, work in progress, and finished goods. Indeed, on an earnings call with analysts and investors on September 25, 2024, to announce the Company's results for the fourth quarter and full year of fiscal 2024

("FY2024 Call"), Mehrotra touted to investors that "***Micron is ramping production of the industry's most advanced technology nodes in both DRAM and NAND***." Accordingly, if the Company was anticipating increased sales and was "ramping production," the Company's inventories would need to materially increase. In addition, if demand proved to be less than anticipated, Micron's inventories would swell.

91. Micron's inventories, however, ***did not meaningfully increase***. As shown in the following chart (value in millions), from Q2FY24 to Q2FY 2025, Micron's inventories remained essentially flat:

| As of | Finished Goods | Work in Progress | Raw Materials | Total |
|---|---|---|---|---|
| Feb. 29, 2024 (Q2 2024) | $1,132 | $6,622 | $689 | $8,443 |
| May 30, 2024 (Q3 2024) | $1,280 | $6,512 | $690 | $8,512 |
| Aug. 29, 2024 (Q4 2024) | $1,308 | $6,774 | $793 | $8,875 |
| Nov. 28, 2024 (Q1 2025) | $1,211 | $6,689 | $805 | $8,705 |
| Feb. 27, 2025 (Q2 2025) | $1,355 | $6,782 | $870 | $9,007 |

92. Indeed, between August 29, 2024 and November 28, 2024, during which time Mehrotra advised investors that the Company was "ramping production," Micron's inventories ***declined***. In other words, when Defendants lowered expectations because of unexpected declines in demand, the Company's inventory situation ***improved***. This is the exact opposite outcome of what should have occurred if the Company was caught unawares when demand had failed to materialize.

93. This inconsistency was reflected when calculating the Company's inventory ratios as well. Specifically, as reflected in the chart below, Micron's inventory turnover and days in

inventory ratios experienced no material changes from the first quarter of fiscal year 2024 to the first quarter of fiscal year 2025, even though Defendants were experiencing what they described as unexpected demand declines.




94. This conclusion is reinforced by the following chart, which show Micron's inventory turnover and days in inventory ratios on a quarterly basis (*i.e.*, for the prior 90 days).




95. On a quarterly basis, the Company's inventory turnover ratio increased and its days in inventory decrease, *i.e.*, both indicators ***improved***. The exact opposite of what would be expected, particularly in comparison to Q1FY23, if the Company had been surprised by a decline in demand.

96. After reviewing this data, Plaintiffs' expert, Mr. Zaydenverg agreed with these conclusions and opined that "Based on a long production cycle, Micron's inventory levels and ratios from the end of fiscal 2024 (*i.e.*, August 29, 2024) through the end of the first quarter of fiscal 2025 (*i.e.*, November 28, 2024), are not consistent with the expectation of a significant rise in revenue in the immediate future." In other words, the data show that Micron was acting as if it was expecting a demand slowdown, not that it was surprised by a demand slowdown.

97. In reality, Defendants had known all along that there was no increase in demand on the horizon, had not "ramped" production and instead had touted the future to prop up the Company's share price so that Mehrotra could reap tens of millions of profits in ill-gotten gains.

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS[23]

98. On March 28, 2023, after the close of trading, Micron issued a press release for its Q2 2023 earnings. It quoted Mehrotra, stating, in pertinent part, that "[c]ustomer inventories are getting better, and we expect gradual improvements to the industry's supply-demand balance. ***We remain confident in long-term demand and are investing prudently to preserve our technology and product portfolio competitiveness***."

99. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that Defendants were "confident in long-term demand," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

100. On March 28, 2023, at its Q2 2023 earnings call, Mehrotra stated that "[w]hile our industry faces significant near-term challenges, ***we believe that the memory and storage TAM will grow to a new record in calendar 2025 and will continue to outpace the growth of the semiconductor industry thereafter***."

101. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "memory and storage TAM will grow to a new record in calendar 2025," Defendants failed to fulfill their duty to disclose the full truth and created a

[23] Plaintiffs have bolded and italicized the portions of each statement that that is materially false and misleading. The plain text portions of the statements appear for context.

misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

102. On that same call, Mehrotra stated that:

> And particularly, keeping it in mind the strong demand trends. ***I talked about 2025 being -- we think will be a record revenue year for the industry because last 2 years have been slow demand growth in terms of shipments. We think '24 and '25 will be strong years that will drive strong growth***. You are seeing actions on the supply side. The health of the industry will be restored in the future quarters.

103. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "we think will be a record revenue year for the industry because last 2 years have been slow demand growth in terms of shipments," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

104. On that same call, Mehrotra answered a question from an analyst as follows:

> **Christopher Muse**
>
> I guess I was hoping to get your sense of how you're thinking about the shape of the recovery. Obviously, things don't look great today, but you've been through this before and will get through it. And so would love to hear your thoughts around how you think will come out of this. And given the CapEx cuts we've seen across the industry, it certainly looks like we're going to be an undersupply situation, at least for DRAM in calendar '24. I'm curious what some of your largest customers are saying today, particularly in the data center as they start to consider this likelihood.
>
> **Sanjay Mehrotra**

> Thanks, C.J., for the question. So I think we can look at the question from the demand and the supply point of view. ***And from the demand side, as we have indicated that we are seeing that the customer inventories are improving while still elevated, but in aggregate, customer inventories are improving. And we do expect that the volume of shipments, both for DRAM and NAND, will continue to increase on a sequential basis from here on.***
>
> ***And of course, on the supply side, you have heard actions from industry players and through various reports, you have seen that the CapEx reductions are being made as well as underutilization is being made in the industry. And that is going to be taking out a chunk of—it will take a bite at the supply in the industry. So basically, the supply trend will also begin to improve. So the demand and supply balance will gradually improve through the course of the year.***

105. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "we do expect that the volume of shipments, both for DRAM and NAND, will continue to increase on a sequential basis from here on," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

106. On June 28, 2023, after the close of trading, Micron issued a press release for its Q3 2023 earnings. It quoted Mehrotra, stating, in pertinent part, that "***We believe that the memory industry has passed its trough in revenue, and we expect margins to improve as industry supply-demand balance is gradually restored***."

107. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "memory industry has passed its trough in revenue, and we expect margins to improve as industry supply-demand balance is gradually restored," Defendants

failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

108. On June 28, 2023, at its Q3 2023 earnings call, Mehrotra stated as follows:

> Micron delivered fiscal third quarter revenue within our guidance range, with gross margin and EPS above the range. ***The ongoing improvement of customer inventories and memory content growth are driving higher industry demand, while production cuts across the industry continue to help reduce excess supply. As a result, pricing trends are improving, and we have increased confidence that the industry has passed the bottom for both quarterly revenue and year-on-year revenue growth***.

109. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "pricing trends are improving, and we have increased confidence that the industry has passed the bottom for both quarterly revenue and year-on-year revenue growth," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

110. On that same call, Mehrotra also stated:

> While the industry demand forecast for calendar 2023 is now lower, the significant supply reductions across the industry have started to stabilize the market. ***We see both DRAM and NAND year-over-year supply growth to be negative for the industry in calendar 2023 as utilization and CapEx cuts across the industry impact supply growth***.

111. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading

because by assuring investors that "We see both DRAM and NAND year-over-year supply growth to be negative for the industry in calendar 2023 as utilization and CapEx cuts across the industry impact supply growth," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

112. On September 27, 2023, Micron issued a press release during after-market hours announcing its fiscal fourth quarter and full year 2023 results. The press release quoted Defendant Mehrotra as stating, in relevant part:

> During fiscal 2023, amid a challenging environment for the memory and storage industry, Micron sustained technology leadership, launched a significant number of leading-edge products, and took decisive actions on supply and cost . . . . ***Our 2023 performance positions us well as a market recovery takes shape in 2024, driven by increasing demand and disciplined supply. We look forward to record industry TAM [total addressable market] revenue in 2025 as AI proliferates from the data center to the edge.***

113. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "Our 2023 performance positions us well as a market recovery takes shape in 2024, driven by increasing demand and disciplined supply," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

114. That same day, Defendant Mehrotra participated in an earnings call for Q4 2023. Mehrotra stated, in pertinent part that "***[o]ngoing demand growth, customer inventory***

***normalization, and industry-wide supply reductions have set the stage for increased revenue, along with improved pricing and profitability throughout fiscal 2024*.”

115. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that “Our 2023 performance positions us well as a market recovery takes shape in 2024, driven by increasing demand and disciplined supply,” Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

116. On that call, Mehrotra responded to a question as follows:

> **Thomas O’Malley**
>
> I just want to understand the trajectory here on the NAND business. You guys in the quarter kind of took your demand profile from high-single-digits to high teens and you pointed out consumer in particular. What can you do to give us confidence that, that wasn’t a pull in from some of your large consumer customers, and that later this year there might be a little hole there, and just talk about the trajectory of where you see that business going, just given you said that bits are going to be down sequentially into November?
>
> **Sanjay Mehrotra**
>
> So with respect to NAND, yes, I mean compared to what we have said before, we saw strong demand, particularly on the consumer, including some parts of the channel and the consumer part included likes of smartphones, PCs, etc, and again, as I pointed out, the channel as well. And keep in mind, with the pricing that has existed for NAND, elasticity has certainly kicked in. The content is continuing to increase in the devices. Today, flagship smartphones have minimum of 8 gigabyte DRAM and 128 gigabyte of NAND. So that’s the overall trend and same thing in PCs that the elasticity is driving, increasing average capacities. And overall certainly strategic vibe have influenced some of the NAND demand for the year as well. ***And keep in mind that next year in 2024, we see that the demand growth will be pretty much close to the long-term CAGR for NAND. And the strat buyers—the strategic buyers that I mentioned, of course, they help***

> ***improve the inventory position for NAND as well. So overall, of course, supply cuts have been made in NAND as well. And as we look ahead, we do see that the demand and supply fundamentals will continue to improve on the NAND side*** as well.

117. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "next year in 2024, we see that the demand growth will be pretty much close to the long-term CAGR for NAND," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

118. Later on that call, Mehrotra responded to a question as follows:

> **Mehdi Hosseini**
>
> Great, thanks for detail. And second question has to do with the puts and takes in reducing wafer starts. And I understand that more emphasis is on the trade mix. But as I think about memory like, there is no trailing edge. And in that context as you think about bringing utilization rate back up to the normal level. and some of the trailing edge converted to the leading edge, could that help with a bigger step-up in gross margin improvement? How should we think about it, assuming that the trailing edge would be phased out?
>
> **Sanjay Mehrotra**
>
> Well, good question and I think I would like to take the opportunity to provide some context here and overall background. As you know that in 2023, the industry has experienced extreme over supply and you know extreme negative effect on the profitability as well. ***And you see now that capex cuts and underutilization in the fab have been implemented across the industry given the capex constraints that we have, as well as given the poor profitability and certainly Micron has done that, but this is happening across the industry as well. And at the same time, the demand for the new products is increasing that requires, you know, as you were pointing out, leading edge technology as well.*** And in order to maintain our supply discipline and to meet the demand for these new products such as HBM, such as DDR5, we are shifting some of our

> equipment from older nodes into the newer technologies to ramp up those newer technologies into production.

119. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and the state of the semiconductor industry and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

120. On October 6, 2023, Micron filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal fourth quarter and year ended August 31, 2023 (the "2023 10-K"). With respect to the purported overall recovery of demand for Micron's products, the 2023 10-K stated, in relevant part:

> ***Ongoing demand growth, customer inventory normalization, and industry-wide supply discipline have set the stage for increased revenue, and improved pricing and profitability throughout fiscal 2024***. As a result, pricing trends have started to improve and there were no write downs of inventories to net realizable value in the fourth quarter of 2023.

121. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "Ongoing demand growth, customer inventory normalization, and industry-wide supply discipline have set the stage for increased revenue, and improved pricing and profitability throughout fiscal 2024," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to

Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

122. The 2023 10-K also stated, in relevant part, that "***demand for DRAM and NAND is improving as customer inventory levels continue to normalize and secular growth drivers remain intact[.]***"

123. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "demand for DRAM and NAND is improving as customer inventory levels continue to normalize and secular growth drivers remain intact," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors because Defendants knew, but did not disclose, the weakness in customer demand and the competitive threat posed by YMTC.

124. On December 20, 2023, Micron issued a press release announcing earnings for the first quarter of fiscal 2024. That press release quoted Mehrotra as stating that "***[w]e expect our business fundamentals to improve throughout 2024, with record industry TAM projected for calendar 2025***."

125. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "[w]e expect our business fundamentals to improve throughout 2024, with record industry TAM projected for calendar 2025," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors

known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

126. That same day, at its Q1 2024 earnings call, Mehrotra stated that:

> Now turning to our market outlook, starting with demand. We expect calendar 2023 DRAM bit demand to grow in the high-single-digit percentage range, up from prior expectations for mid-single-digit growth. In NAND, we continue to expect calendar 2023 bit demand growth in the high-teens percentage range. ***Looking forward, over the next few years, we expect bit demand growth CAGRs of mid-teens in DRAM and low-20s percentage range in NAND. We forecast calendar 2024 bit demand growth for the industry to be near the long-term CAGR for DRAM and somewhat below the long-term CAGR for NAND***.

127. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "we expect bit demand growth CAGRs of mid-teens in DRAM and low-20s percentage range in NAND. We forecast calendar 2024 bit demand growth for the industry to be near the long-term CAGR for DRAM and somewhat below the long-term CAGR for NAND," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

128. On that same call, Mehrotra responded to an analyst question as follows:

> **Krish Sankar**
>
> Yes. Hi. Thanks for taking my question. Sanjay or Mark, the first question I had is kind of you spoke about sustainability of pricing in calendar '24. I'm kind of curious if you can peel the onion one layer below and say how we think about pricing through calendar '24 for DRAM and NAND, and if you can extrapolate it into 2025, that'll be very helpful. And then I had a follow-up.
>
> **Sanjay Mehrotra**

> Thanks, Krish for the question. And with respect to the pricing, ***we of course expect pricing to continue to strengthen during calendar 2024. And this is because of the healthy demand-supply balance as we discussed in the context of our script.*** As you have seen, there have been significant cuts in supply growth in the industry. Customer inventories have normalized, supplier inventories are improving, as we have discussed our own inventory here as well. And pricing will continue to improve as a result through the course of the year.
>
> And of course, you know, ***the demand trends overall, because of improvement of customer inventories are in PCs, in smartphones, automotive and industrial, the demand trend will continue. And in sometime in first half of '24, calendar '24, we expect data center inventories at customers to get normalized as well. And beyond that point, we would expect data center to become another boost in demand in 2024. So we expect pricing to continue to increase both in NAND and in DRAM as well. And we expect a healthy demand-supply environment in 2025 as well as a healthy pricing environment in '25 too.***

129. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors about the strength of the NAND and DRAM market for 2024 and 2025, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

130. On December 21, 2023, Micron filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter of its fiscal year 2024 (the "1Q24 10-Q"). With respect to the purported overall recovery of demand for Micron's products, the 1Q24 10-Q stated, in relevant part:

> ***For the first quarter of 2024, improving demand growth driven in part by deployment of [AI], customer inventory normalization, and industry-wide supply discipline, resulted in an improved industry supply and demand balance***. As a result, we have experienced improvements in pricing and margins.

131. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize and provide reasons for a purported "supply and demand balance," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

132. The 1Q24 10-Q also stated, in relevant part, that "for the first quarter of 2024 as compared to the fourth quarter of 2023 . . . MBU revenue increased 7% primarily due to increases in average selling prices and NAND bit shipments, ***driven by improved end market demand***."

133. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize NAND demand, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

134. On March 20, 2024, on an earnings call for Q2 2024, Mehrotra stated, in pertinent part, that:

> Now, turning to our market outlook. Calendar 2023 DRAM bit demand growth was in the low double-digit percentage range, and NAND bit demand growth was in the low-20s percentage range, both a few percentage points higher than previous expectations. ***We forecast calendar 2024 bit demand growth for the industry to be near the long-term CAGR for DRAM and around the mid-teens for NAND***.

> Given the higher baseline of 2023 demand, these expectations of 2024 bit growth have driven an increase in the absolute level of 2024 bit demand in our model for DRAM and NAND versus our prior expectations. ***The industry supply-demand balance is tight for DRAM and NAND, and our outlook for pricing has increased for calendar 2024. Over the medium term, we expect bit demand growth CAGRs of mid-teens in DRAM and low-20s percentage range in NAND***.

135. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors about the strength of the NAND and DRAM market for 2024 and 2025, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

136. On that same call, Defendant Murphy stated that "[n]ow turning to our outlook for the fiscal third quarter. Fiscal Q3 bit shipments are expected to be down modestly for DRAM and up somewhat for NAND, compared to fiscal Q2 levels. ***While demand continues to improve, supply is constrained, especially at the leading edge. We expect DIO to improve sequentially in fiscal Q3***."

137. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "While demand continues to improve, supply is constrained, especially at the leading edge. We expect DIO to improve sequentially in fiscal Q3," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

138. On March 21, 2024, Micron filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the second quarter of its fiscal year 2024 (the "2Q24 10-Q"). With respect to the purported overall recovery of demand for Micron's products, the 2Q24 10-Q stated, in relevant part:

> For the first six months of 2024, ***increasing demand growth, driven in part by deployment of [AI] and mostly normal customer inventories, combined with industry-wide supply discipline, resulted in an improved industry supply and demand balance***. As a result, we have experienced improvements in pricing and margins in 2024.

139. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize semiconductor supply and demand as "balanced," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

140. The 2Q24 10-Q also stated, in relevant part, that "for the second quarter of 2024 as compared to the first quarter of 2024 . . . SBU revenue increased 39% primarily due to increases in NAND average selling prices and bit shipments ***driven by strong demand across markets***" and that "CNBU, MBU, and SBU operating income (loss) improved primarily due to increases in average selling prices ***as a result of improving conditions across most markets***."

141. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize affirmatively semiconductor markets, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for

investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

142. On June 26, 2024, Micron issued a press release announcing its results for the third quarter of its fiscal year 2024, which quoted Defendant Mehrotra as stating, in relevant part, that Micron is "***well positioned to deliver a substantial revenue record in fiscal 2025***."

143. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize Micron's revenue producing ability, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

144. That same day, on an earnings call with analysts and investors to report the Company's financial results for the third quarter of FY2024 ("3QFY24 Call"), Mehrotra touted the coming increased demand for DRAM and NAND:

> Enabling AGI will require training ever-increasing model sizes with trillions of parameters and sophisticated servers for inferencing. AI will also permeate to the edge via AI PCs and AI smartphones, as well as smart automobiles and intelligent industrial systems. ***These trends will drive significant growth in the demand for DRAM and NAND, and we believe that Micron will be one of the biggest beneficiaries in the semiconductor industry of the multi-year growth opportunity driven by AI***.

145. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize the demand of DRAM and NAND, Defendants failed to

fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

146. On that same call, surprised by Mehrotra's bullish statements, analysts pushed scrutinized Mehrotra's boasts. For example, analyst Krish Sankar of TD Cowen asked Mehrotra:

> Another quick follow-up, on NAND, in this -- on the NAND bit demand, you kind of mentioned that the bit growth -- demand bit growth is going to be in the high teens. If I remember right, last quarter, you said it's going to be in the low 20%s. So, I'm kind of curious, what was the delta since last few months ago? Because there's a general view that AI should be helping NAND. So, why is the NAND bit demand growth not going higher? Looks like it's going lower.

147. Rather than come clean, Mehrotra stuck to his story, assuring Cowen that NAND demand would remain high:

> I'll just provide you some color. The data center, automotive, and industrial, these are all growing faster in terms of NAND demand versus the CAGR that we have shared. Client, mobile, and consumer somewhat slower. ***But these slow-growing segments actually have also average capacity increases ahead of them***.

148. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize the NAND segment, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

149. The next day, June 27, 2024, Micron filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the third quarter of its fiscal

year 2024 (the "3Q24 10-Q"). With respect to the purported overall recovery of demand for Micron's products, the 3Q24 10-Q stated, in relevant part:

> For the first nine months of 2024, ***increasing demand growth, driven in part by deployment of [AI] and mostly normal customer inventories, combined with industry-wide supply discipline, resulted in an improved industry supply and demand balance***. As a result, we have experienced improvements in pricing and margins in 2024.

150. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize the semiconductor supply and demand, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

151. The 3Q24 10-Q also stated, in relevant part, that "[f]or the third quarter of 2024 as compared to the third quarter of 2023, CNBU, MBU, and SBU operating income (loss) improved primarily due to increases in average selling prices . . . and increases in bit sales a***s a result of improving conditions across most markets in 2024***"; and that "[f]or the first nine months of 2024 as compared to the first nine months of 2023, operating income (loss) improved for CNBU, MBU, and SBU primarily due to . . . increases in bit sales, and increases in MBU and SBU average selling prices ***as a result of improving conditions across most markets in 2024***."

152. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize the semiconductor market, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors

and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

153. On September 25, 2024, Micron issued a press release announcing its fiscal fourth quarter and FY2024 results, in which Defendant Mehrotra touted the Company's future with using a host of superlatives, including "***We are entering fiscal 2025 with the best competitive positioning in Micron's history. We forecast record revenue in fiscal Q1 and a substantial revenue record with significantly improved profitability in fiscal 2025***."

154. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize Micron's competitive positioning, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

155. That same day, on an earnings call with analysts and investors to disclose the Company's fourth quarter and full year for FY24 ("FY24 Call"). On the call, Mehrotra touted to investors

> ***Given the significant reduction in industry wafer capacity in NAND and the ongoing low NAND CapEx environment, we also expect a healthy industry supply-demand environment for NAND in calendar 2025***. NAND technology transitions generally provide more growth in annualized bits per wafer compared to the NAND bit demand CAGR expectation of high teens.

156. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading

because by electing to characterize supply and demand for the NAND segment, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

157. Also on FY24 Call, Mehrotra touted that "[w]e look forward to delivering a substantial revenue record with significantly improved profitability in fiscal 2025, beginning with our guidance for record quarterly revenue in fiscal Q1. ***Micron is ramping production of the industry's most advanced technology nodes in both DRAM and NAND***."

158. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants' failed to disclose that Micron was ***not*** ramping production and was anticipating a slowdown in demand.

159. During the question and answer portion of the call, analyst CJ Muse of Cantor Fitzgerald asked Defendant Murphy:

> I guess first question on gross margins. You guided up a robust 300 basis points. I was hoping you could spend a little bit of time kind of walking us through what's driving that? How much is from like-for-like DRAM ASP increases, mix, HBM yield improvements and cost downs. And I guess, as you kind of walk through that, can you give us a flavor of how to think about those drivers beyond the November quarter?

160. Murphy responded by touting how Micron would benefit in the first quarter of fiscal year 2024:

> So C.J., in the fourth or first quarter, as we look at that margin expansion, it's similar to the themes we've talked about before. ***The supply-demand environment is healthy.*** So we're seeing that play through on -- in pricing. We're also seeing the execution of our product road map and the ramp of the higher-value products and that's contributing. On costs, we are doing well on cost downs.

> However, in the first quarter because of the mix with HBM, we are going to see DRAM costs go up slightly. ***And that's so as we look forward into the first quarter, things are coming together as we had hoped, tied at the leading edge, good supply demand, favorable pricing environment and certainly favorable mix and that becoming a more important part of the business and good cost execution***.

161. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants' failed to disclose that Micron was ***not*** ramping production and was anticipating a slowdown in demand. In addition, by affirmatively characterizing the supply-demand environment, Defendants had a duty to disclose the full truth, including that they were acting in anticipation of slowing, not healthy, demand.

162. On October 4, 2024, Micron filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal fourth quarter and year ended August 29, 2024 (the "2024 10-K"). With respect to the purported overall recovery of demand for Micron's products, the 2024 10-K stated, in relevant part:

> Throughout 2024, we experienced substantial improvements in pricing and margins. ***Increasing demand growth, driven in part by deployment of AI and mostly normal customer inventories, combined with industry-wide supply discipline, resulted in an industry supply and demand balance that substantially improved from 2023 conditions***. We executed well on pricing and improved our financial performance significantly from the start of the year. ***We are exiting the year with excellent momentum and an industry-leading product portfolio***.

163. The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants' failed to disclose that Micron was ***not*** ramping production and was anticipating a slowdown in demand. In addition, by affirmatively characterizing the supply-demand environment, Defendants had a duty to disclose the full truth, including that they were acting in anticipation of slowing, not healthy, demand.

## VII. THE TRUTH EMERGES

164. As set forth above, in the months leading up to the announcement of Micron's earnings for the first quarter of fiscal year 2025, Defendants touted repeatedly touted the strength of the semiconductor market and the Company's ability to thrive in that market. These touts included, in June 2024, assurances that Micron was "***well positioned to deliver a substantial revenue record in fiscal 2025***," and "***trends will drive significant growth in the demand for DRAM and NAND***"; and, in September 2024, assurances that Micron was "***entering fiscal 2025 with the best competitive positioning in Micron's history***," "***expect[ing] a healthy industry supply-demand environment for NAND in calendar 2025***," "***look[ing] forward into the first quarter [with] things are coming together as we had hoped, tied at the leading edge," and "exiting the year [FY2024] with excellent momentum and an industry-leading product portfolio***."

165. Investors thus were stunned on December 18, 2024, when, immediately after have predicted "***revenue record in fiscal 2025***" and described "***the best competitive positioning in Micron's history***"—and, not coincidentally, after enough time had passed after Mehrotra had lined his pockets with over $77 million in proceeds at investors' expense—Defendants finally disclosed what they had known all along: that semiconductor supply and demand were not aligned, Micron had been materially overstating its prospects, and the Company's revenue predictions and descriptions of the market were materially misleading.

166. On December 18, 2024, after the close of trading, Micron issued a press release announcing its financial results for the first quarter of its fiscal year 2025 (the "1Q25 Earnings Release"). At the same time, Micron issued its quarterly report for the first quarter of its fiscal year 2025 (the "1Q25 10Q"). Among other things, these disclosures revealed that "Sales of

NAND products decreased 5% primarily due to a low-single-digit percent range decrease in bit shipments and a low-single-digit percent range decrease in average selling prices," *i.e.*, decreased demand.

167. Mehrotra then issued disappointing guidance for the second quarter of its fiscal year 2025, including adjusted earnings between $1.33 and $1.53 per share, well below the $1.92 per share estimate; sales between $7.7 billion and $8.1 billion, with the midpoint well below the $8.99 billion estimate; and adjusted gross margins between 37.5% and 39.5%, well below the 41.3% estimate. In addition, Defendant Mehrotra, as quoted in the 1Q25 Earnings Release, disclosed that "***consumer-oriented markets are weaker in the near term[.]***" This was the opposite of what Mehrotra had assured investors throughout the Class Period, including most recently in response to analyst questions on the Q324 and FY24 Calls.

168. Also on December 18, 2024, on a call with investors to disclose the Company's first-quarter fiscal year 2025 financial performance ("Q125 Call"), Mehrotra elaborated on the factors that led to its disappointing revenue decline in NAND flash memory and disappointing guidance. In particular, Mehrotra revealed that, despite his prior assurances about the NAND market, supply and demand were not in alignment, and demand was slowing.

> Our outlook for industry NAND bit demand growth in both calendar 2024 and 2025 is now in the low-double-digits percentage range, which is lower than our prior expectations. ***Key drivers include slower growth in NAND content in consumer devices, ongoing inventory adjustments and demand dynamics in different end markets, as outlined earlier, and a temporary moderation in near-term data center SSD purchases by customers after several quarters of very rapid growth***.
>
> In data center, we remain enthusiastic about long-term demand growth as NAND is a key enabler for AI workloads, providing faster data access, lower power and better overall total cost of ownership essential for AI infrastructure. In the next few years, we also expect high-capacity NAND SSDs to start displacing capacity HDDs in the data center, an inflection that will drive long-term NAND demand

> growth. ***The decline in 2024 and 2025 industry NAND demand growth outlook implies that supply actions will be necessary to achieve balance.***

169. Incredibly, Mehrotra stated that the Company would need to produce fewer NAND chips, less than three months after he had touted to investors that Micron was "***ramping production***" to meet demand.

> As mentioned previously, since NAND technology transitions provide a significant increase in overall bit output, the pace of technology transitions will also need to slow in order to align supply to industry demand. Micron is decisively taking actions to align our NAND supply with industry demand trends. ***We have reduced NAND CapEx versus prior plan and have slowed the pace of technology node transitions***.
>
> In addition, ***we are reducing NAND wafer starts by a mid-teens percentage versus prior levels. These actions will align our supply to current market demand.***

170. Mehrotra's disclosure of the need to reduce production was especially curious since they were entirely inconsistent with what the Company had said it was doing in September 2024 (*i.e.*, midway through 1Q25), and during the quarter the Company's inventory of raw materials, work in progress, and finished goods had not materially changed over the quarter and its inventory turnover and days in inventory had improved.

171. Continuing on the Q125 Call, Mehrotra told attendees that:

> Consistent with analyst reports, ***we have seen an increase in bit supply at legacy technology nodes from a China-based DRAM and a China-based NAND supplier.*** In calendar 2024, analyst reports indicate that China-based supply will represent a mid-single-digit percentage of industry bit supply for DRAM and a high-single-digit percent of supply for NAND.
>
> Competition from China supply is focused on China market demand in DRAM with DDR4 and LP4 products and in NAND with consumer, client and lower performance mobile products. ***We expect Micron's worldwide revenue related to LP4 and D4 DRAM products for the remainder of fiscal 2025 to be approximately 10%.***

172. The next day, multiple analysts lowered their price targets for Micron stock, citing the Company's disappointing guidance for the second quarter of its fiscal year 2025, while noting significant weakness in demand in its consumer markets, especially for its NAND products.

173. For example, in reducing its price target from $135 to $125, UBS wrote that Micron's fiscal second quarter 2025 "[g]uidance was below even the most bearish bogeys . . . with the company citing ongoing malaise in consumer markets—especially PC—which is hurting the NAND business in particular."

174. Similarly, in reducing its price target to $110 from $125 and downgrading Micron stock to a "Neutral" rating from a "Buy" rating, Bank of America wrote that "weakness in PC and phone markets are putting downward pressure on memory pricing, especially in NAND."

175. Likewise, in reducing its price target to $98 from $114, Morgan Stanley, calling the announcement "surprising" wrote that "NAND weakness [had] take[n] its toll[,]" noting that "Micron guided revenue below expectations driven mostly by revenue decline in NAND[,]" that "NAND will drive most of the revenue decline in February, which implies a sequential decline of about 20% in revenue[,]" and that "Micron has very clearly decided that NAND is oversupplied, cutting capex, cutting back on wafer starts by about 15%, and preparing for a sustained period of weak demand."

176. Analyst firm Susquehanna noted that "NAND revenue was approximately $2.2B during the Nov-Q, accounting for 26% of Micron's total revenue. NAND revenue declined -5% sequentially, with bit shipments down in the low-single digit percentage range and ASPs declining as well low single digits."

177. Morningstar, lowering its fair value estimate to $100 from $110, stated that:

> The firm's outlook for the February quarter implies a 9% sequential decline in revenue, with management citing weakness in PC and mobile phone demand.
>
> Why it matters: Micron's outlook was more than 10% below our expectations. We now expect significantly weaker NAND revenue for Micron in fiscal 2025, as the firm's NAND chip sales are more exposed to PC and mobile phone shipments. We also expect this to weigh on gross margin. We expect lower medium-term NAND results as well, with management announcing plans to cut its capital investment in NAND production and to reduce utilization at its existing factories. We don't see a near-term upward inflection for PC and smartphone demand. Positively, management raised its expectations for high-bandwidth memory growth over the next five years. We expect better DRAM and HBM shipments into data centers to partially offset our weaker NAND forecast.

178. Morningstar went on to state that "We are skeptical of a snapback in revenue after the February quarter, given that we expect increasing pricing pressure for both DRAM and NAND."

179. Following the 1Q25 Earnings Release and reduced-price targets issued by analysts for Micron stock, the Company's stock price fell $16.81 per share, or 16.18%, to close at $87.09 per share on December 19, 2024.

180. The disclosures in the 1Q25 Earnings Release both corrected the market's misimpression Micron's business operations, which had been inflated by Defendants' misrepresentations, and constituted a materialization of the concealed risk that when the market learned the truth about the Company's prospects, the stock price would plummet.

181. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

### A. Additional Allegations in Support of Mehrotra's Scienter

182. Mehrotra's stock sales create a powerful motive to create fraud. Shortly after Mehrotra began promising that 2025 would be a record year for Micron and the wider industry, Mehrotra entered into a 10b5-1 plan that led to him selling 799,284 shares of Micron stock for total proceeds of $77,471,537.52 *before* Micron's supposed record year of 2025. This demonstrates that Mehrotra was in possession of material nonpublic information that contradicted his rosy predictions.

183. Further supporting scienter is the fact that Defendant Mehrotra made repeated statements to investors about the supply and demand environment for its products throughout the Class Period in a multitude of press releases and earnings calls. Mehrotra made numerous confident statements regarding the industry-wide supply and demand environment for NAND and DRAM products, indicating that he had specific knowledge about the facts underlying his statements. Having spoken on these subjects so many times, Defendant Mehrotra either knew, or was deliberately reckless in not knowing, that the statements about the memory chip supply and demand environment were false and misleading and omitted material information.

184. Further supporting the inference of Mehrotra's scienter is the fact that, in announcing its Q1 2025 results, Micron's inventory levels remained flat, and Micron did not write down any inventory due to discounting. Given, as set forth in section V.B above, that the manufacturing process for memory chips is complicated and lengthy, it is implausible that Micron could have avoided overproduction unless Micron's officers had anticipated the weakness in NAND demand and pulled back production well in advance. Indeed, in Micron's fiscal year 2023, when the Company was surprised by a decline in demand, it was forced to write off $1.83 billion in inventory, its inventory levels exploded, and its inventory turnover and days

in inventory ratios cratered. Throughout fiscal year 2024 and the first quarter of fiscal year 2025, however, Micron's inventory disclosures were either flat or improved.

185. Further supporting the inference of Mehrotra's scienter is the fact that the factors Mehrotra identified as leading to weaker than expected results and projections for the first quarter of 2025, including growth levels in consumer device demand, inventory adjustments in NAND markets, and moderation in data center SSD purchases, as well as the competitive threat posed by YMTC, were all factors of which Micron had long notice. As set forth in ¶ 68 and V.E *supra*, Micron's customers work closely with Micron on long term agreements to determine customers' long term needs. In addition, the news media regularly reported on the progress of YMTC, and Micron itself acknowledged YMTC as a competitive threat.

186. Further supporting the inference of Mehrotra's scienter is the fact that Mehrotra received and reviewed the Company's Flash Reports, which detailed sales results and forecasts and thus communicated to Mehrotra the status of demand, sales, and inventory.

**B. Additional Allegations in Support of Murphy's Scienter**

187. Further supporting the inference of Murphy's scienter is the fact that, in announcing its Q1 2025 results, Micron's inventory levels remained flat, and Micron did not write down any inventory due to discounting. Given, as set forth in section V.B *supra*, that the manufacturing process for memory chips is complicated and lengthy, it is implausible that Micron could have avoided overproduction unless Micron's officers had anticipated the weakness in NAND demand and pulled back production well in advance.

188. Further supporting the inference of Murphy's scienter is the fact that the factors Mehrotra identified as leading to weaker than expected results and projections for the first quarter of 2025, including growth levels in consumer device demand, inventory adjustments in

semiconductor markets, and moderation in data center SSD purchases, as well as the competitive threat posed by YMTC, were all factors of which Micron had long notice. As set forth in sections ¶68 and V.E *supra*, Micron's customers work closely with Micron on long term agreements to determine customers' long term needs. In addition, the news media regularly reported on the progress of YMTC, and Micron itself acknowledged YMTC as a competitive threat.

189. Further supporting the inference of Murphy's scienter is the fact that Murphy received and reviewed the Company's Flash Reports, which detailed sales results and forecasts and thus communicated to Murphy the status of demand, sales, and inventory.

## I. CLASS ACTION ALLEGATIONS

190. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Micron, between March 29, 2023, and December 18, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

191. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Micron's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Micron shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Micron or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

192. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

193. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

194. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Micron; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

195. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## II. APPLICABILITY OF PRESUMPTION OF RELIANCE

196. The market for Micron's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose alleged herein, Micron's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Micron's securities and market information relating to Micron, and have been damaged thereby.

197. During the Class Period, the artificial inflation of Micron's shares was caused by the material misrepresentations and/or omissions alleged in this Complaint causing the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Micron's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Micron and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Micron's securities at such artificially inflated prices, and each of them has been damaged as a result.

198. At all relevant times, the market for Micron's securities was an efficient market for the following reasons, among others:

(a) Micron shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Micron filed periodic public reports with the SEC and/or the NASDAQ;

(c) Micron regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Micron was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

199. As a result of the foregoing, the market for Micron's securities promptly digested current information regarding Micron from all publicly available sources and reflected such information in Micron's share price. Under these circumstances, all purchasers of Micron's securities during the Class Period suffered similar injury through their purchase of Micron's securities at artificially inflated prices and a presumption of reliance applies.

200. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Because the Class's claims are, in large part, grounded on Defendants' omissions of adverse information, which Defendants had a duty to disclose, regarding Micron's business operations and financial prospects, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor

might have considered them important in making investment decisions. Given the importance of the withheld information, as set forth above, that requirement is satisfied here.

## III. NO SAFE HARBOR

201. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Micron who knew that the statement was false when made.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

202. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

203. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs

and other members of the Class to purchase Intel's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

204. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Intel's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

205. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Intel's financial well-being and prospects, as specified herein.

206. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Intel's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Intel and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

207. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

208. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Intel's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to

obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

209. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Intel's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Intel's securities during the Class Period at artificially high prices and were damaged thereby.

210. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Intel was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Intel securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

211. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

212. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

213. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

214. Individual Defendants acted as controlling persons of Intel within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

215. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

216. As set forth above, Intel and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the

Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED: May 23, 2025

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jonathan Stern*
Jonathan Stern (*admitted pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
jstern@rosenlegal.com

**POMERANTZ LLP**
Brian Calandra (*admitted pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**RAMSDEN, MARFICE, EALY & DE SMET, LLP**
700 Northwest Blvd.
P.O. Box 1336
Coeur d'Alene, ID 83816-1336
Telephone: (208) 664-5818
Facsimile: (208) 664-5884
Marcus E. Johnson, ISB #10350
mjohnson@rmedlaw.com
Michael E. Ramsden, ISB #2368
mramsden@rmedlaw.com

*Liaison Counsel for Lead Plaintiffs and the Class*

**MILLER SHAH LLP**
Jayne A Goldstein *(pro hac vice forthcoming)*
1640 Town Center Circle, Suite 216
Weston, FL 33326
(954) 515-0123
Email: jgoldstein@sfmslaw.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton *(pro hac vice forthcoming)*
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Additional Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of May, 2025, I served a true and correct copy of the foregoing on counsel of record via the United States District Court for the District of Idaho's CM/ECF system.

By: *\/s/ Jonathan Stern*
Jonathan Stern