**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Brian Calandra (*admitted pro hac vice*)
bcalandra@pomlaw.com

**THE ROSEN LAW FIRM P.A.**
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Jonathan Stern (admitted *pro hac vice*)
jstern@rosenlegal.com

*Attorney for Lead Plaintiffs*

*- additional counsel on signature page -*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE: MICRON TECHNOLOGY, INC. SECURITIES LITIGATION | Case No. 1:25-CV-00191-BLW |
| THIS DOCUMENT RELATES TO: *All Actions.* | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS..................................................................................................................i

PRELIMINARY STATEMENT .....................................................................................................1

FACTUAL BACKGROUND ..........................................................................................................3

A.    Background of Micron and DRAM and NAND Semiconductor Chips. ..............................3

B.    Micron Suffers Severe Losses After an Unexpected Demand Decline ...............................5

C.    After Months of Severe Decline, Defendants Suddenly Tout Micron's Future ...................5

D.    Defendants' Touts Were Inconsistent with Statements from Industry Observers and Competitors and Developments in China ............................................................................6

E.    The Truth Emerges, Devastating Investors...........................................................................6

F.    Defendants Knew of and Exploited the Market Downtown ................................................7

ARGUMENT ...................................................................................................................................8

A.    THE AC PLEADS ACTIONABLE MISSTATEMENTS ....................................................9

    1.    Defendants' Misleading Touting of Micron's Prospects Is Actionable....................9

    2.    Defendants' Misstatements Find No Refuge in Any Safe Harbor............................11

    3.    Defendants' Misrepresentations Were Not {uffery. ...............................................12

    4.    Defendants' Misstatements Are Not Inactionable Opinions ...................................13

B.    THE AC PLEADS A STRONG INFERENCE OF SCIENTER .........................................14

    1.    Defendants' Motive for Fraud .................................................................................15

    2.    Knowledge and Recklessness Allegations Strongly Evidence Scienter .................17

    3.    The Core Operations Doctrine Bolsters the Scienter Inference...............................19

    4.    A Holistic Analysis Supports an Inference of Defendants' Scienter .......................20

CONCLUSION..............................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Azar v. Yelp, Inc.*,
  2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ...........................................................16

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ....................................................................................9

*Bielousov v. GoPro, Inc.*,
  2017 WL 3168522 (N.D. Cal. July 26, 2017)...........................................................18

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharm., Inc.*,
  2022 WL 4491093 (S.D. Cal. Sept. 27, 2022)....................................................15, 16

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) ...................................................................................10

*E. Ohman J. v. NVIDIA Corp.*,
  81 F. 4th 918 (9th Cir. 2022) (Mot. ) ......................................................................17

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)...................................................................................................8

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ..............................................................................12, 20

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ......................................................................................11

*In re Aspeon, Inc. Sec. Litig.*,
  168 F. App'x. 836 (9th Cir. 2006) ............................................................................18

*In re BioMarin Pharm. Inc. Sec. Litig.*,
  2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ..............................................................16

*In re Countrywide*,
  554 F. Supp. 2d (C.D. Cal. May 14, 2008) ..............................................................19

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) .................................................................................17

*In re Dermtech, Inc. Sec. Litig.*,
  2025 WL 1618193 (S.D. Cal. June 5, 2025)..................................................14, 15, 16

*In re Fibrogen, Inc.*,
  2022 WL 2793032 (N.D. Cal. July 15, 2022)...........................................................19

*In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*,
No. 2:23-CV-10619-HDV-SK, 2025 WL 714171 (C.D. Cal. Mar. 3, 2025) .........................13

*In re Nektar Therapeutics Sec. Litig.*,
34 F. 4th 828 (9th Cir. 2022) ...............................................................................................18

*In re Networks Assocs., Inc. II Sec. Litig.*,
2003 WL 24051280 (N.D. Cal. Mar. 25, 2003)......................................................................15

*In re Peoplesoft, Inc.*,
2000 WL 1737936 (N.D. Cal. May 25, 2000) ...................................................................9, 10

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..................................................................................11, 14, 19

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ................................................................................................16

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018)..............................................................................20

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................................................13

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ..................................................................................16

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ..............................................................................................15

*Institutional Inv'rs Grp v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)..................................................................................................19

*Jackson v. Carey*,
353 F.3d 750 (9th Cir. 2003) ................................................................................................20

*Jaeger v. Zillow Grp., Inc.*,
644 F. Supp. 3d 857 (W.D. Wash. 2022)....................................................................11, 12, 13

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ..................................................................................................8

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. Mar. 20, 2022)................................................................................18

*Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022) ...............................................................................................10

iii

*Maiman v. Talbott*,
   2010 WL 11421950 (C.D. Cal. Aug. 9, 2010)..........................................................................20

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ..............................................................................................16

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ..................................................................................................9

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp.3d 999 (N.D. Cal. Oct. 5, 2020) .......................................................................15

*Mulligan v. Impax Lab'ys, Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .....................................................................................13

*Nathanson v. Polycom, Inc.*,
   2015 WL 12964727 (N.D. Cal. Apr. 16, 2015) ......................................................................12

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ..................................................................................................8

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ....................................................................................15, 17, 20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015).................................................................................................................14

*Petersen v. Stem, Inc.*,
   2024 WL 4602710 (N.D. Cal. Aug. 30, 2024) .......................................................................15

*Plumbers & Pipefitters Loc. Union No. 719 Pension Tr. Fund v. Dick's Sporting
   Goods, Inc.*,
   2025 WL 2325122 (W.D. Pa. Aug. 12, 2025) ........................................................................13

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
   2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ..........................................................................17

*Police Ret. Sys of St. Louis. v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................................................18

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ..................................................................................................16

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)......................................................................................................19

*Salzman v. ImmunityBio, Inc.*,
   753 F. Supp. 3d 1050 (S.D. Cal. 2024)...................................................................................18

iv

*Sigman v. Nuscale Power Corp.*,
   2025 WL 1455432 (D. Or. May 21, 2025) ..............................................................11

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...............................................................................20

*Tadros v. Celladon Corp.*,
   2016 WL 5870002 (S.D. Cal. Oct. 7, 2016) ...........................................................18

*Tellabs, Inc. v. Makor Issues & Rts, Ltd.*,
   551 U.S. 308 (2007)...................................................................................... *passim*

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................................................19

*W. Pennsylvania Elec. Emps. Pension Fund v. Mentor Graphics Corp.*,
   2017 WL 3668957 (D. Or. June 2, 2017), *report and recommendation
   adopted sub nom. W. Pennsylvania Elec. Fund v. Mentor Graphics Corp.*,
   2017 WL 3622779 (D. Or. Aug. 23, 2017)...............................................................9

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) ..............................................................14, 16

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ...............................................................................11

**Statutes**

Private Securities Litigation Reform Act of 1995 ....................................................8, 11

Securities Exchange Act of 1934...............................................................................8

**Rules**

Fed. R. Civ. P. 9(b) ...................................................................................................8

Fed. R. Civ. P. 12(b)(6)..............................................................................................8

Lead Plaintiffs Morris Zelikovsky, Ronald Timms, and David A. Milman (collectively, "Plaintiffs") respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss (ECF No. 60-1 (the "Motion")) the Amended Complaint (ECF. No. 59) ("AC").[1]

## PRELIMINARY STATEMENT

Micron's business overwhelmingly consists of manufacturing and selling dynamic random access memory ("DRAM") and NAND flash memory ("NAND") semiconductor chips, which are used in consumer products like PCs, smartphones, tablets, and cameras, as well as commercial and industrial applications. In the months prior to the Class Period, the market for Micron's products declined precipitously and unexpectedly, and the Company ultimately wrote off *$1.83 billion* in inventory in fiscal year 2023 (September 2022 to August 2023).

After this lengthy stretch of poor performance, Defendants began touting improving supply and demand dynamics and the Company's prospects. Throughout the Class Period, Defendants claimed that demand for Micron's products, including consumer-oriented and NAND products, was recovering and supply was coming into line with industrywide demand, assuring that Micron was on track for record revenues in FY25. These claims drove Micron stock to the stratosphere. Beginning the Class Period at $59.28 per share, Micron's share price exploded to $153.45 15 months later, concluding the class period at $103.90, a gain of 75.3%.

As they were making these rosy assessments of Micron's business, which were far more bullish than those by industry watchers and Micron's competitors, Mehrotra created a plan to sell massive amounts of stock. During the Class Period Mehrotra sold 799,284 shares of stock for $77,471,537.52. This unprecedented selling spree was out of character for Mehrotra. In fact, *eclipsing his prior history by more than 7,873.6%*. Even more suspicious, the sales occurred *before* the promised record year of 2025, when the stock price would ostensibly peak.

---

[1] Capitalized terms, abbreviations, and acronyms not defined herein have the definitions assigned in the AC. Unless otherwise noted, internal citations are omitted, and emphasis is added. References to "¶" are to AC paragraphs. References to "Mot." and "Rowe Decl." are to the Motion and the Declaration of Betty C. Rowe (ECF No. 60-3), respectively.

Having reaped a windfall at the expense of investors, Defendants admitted the truth. On December 18, 2024, Defendants announced Micron's financial results for the first quarter of its fiscal year 2025 ("1Q25"). Defendants disclosed, in stark contrast to Defendants' promises of record performance and increased production *only three months earlier*, soft customer demand and a greater-than-expected revenue decline in NAND flash memory. Defendants then reduced their sales guidance for 2Q25 by approximately $1 billion, or from $8.99 billion to between $7.7 billion and $8.1 billion. The next day, multiple analysts lowered their price targets for Micron stock, citing the Company's disappointing guidance for the second quarter of its fiscal year 2025, while noting significant weakness in demand in its consumer markets, especially for its NAND products. Micron's stock price fell $16.81 per share, or 16.18%, to close at $87.09 per share on December 19, 2024, a stunning decline of *43.2%* from the share price high of $153.45.

Although Defendants played off the disappointing 1Q25 results as unforeseen, Micron's financial statements indicated that Defendants had known all along that poor performance was imminent. For example, after 1Q25, Micron did not write down the value of inventory, its inventories did not spike, and the ratios apprising investors of its inventory management status *improved* over the final months of the Class Period. This stood in stark contrast to what the Company experienced during the 2022 downturn, when Micron's inventory ratios worsened dramatically, its inventories skyrocketed, and the Company wrote off $1.83 billion in inventory. According to a forensic accounting expert retained by Plaintiffs, "Micron's inventory levels and ratios from the end of fiscal 2024 (*i.e.*, August 29, 2024) through the end of the first quarter of fiscal 2025 (*i.e.*, November 28, 2024), are not consistent with the expectation of a significant rise in revenue in the immediate future." In other words, contrary to their statements to investors, Defendants had expected and prepared for a demand slowdown. As a result of Defendants' materially false and misleading statements regarding demand, Plaintiffs initiated this action.

Attempting to evade liability, Defendants ask the Court to dismiss the AC because their statements were (i) not misleading; (ii) puffery; (iii) opinions; (iv) protected forward-looking statements; or (vi) not made with scienter. None of these arguments have merit. *First*,

2

Defendants' statements were materially misleading for failing to disclose declining demand, misalignment of supply and demand, an impending revenue decline, and increased Chinese competition. *Second*, long lead times for microchip manufacturing gave Defendants a unique window into Micron's prospects, and investors relied on Defendants' characterizations of supply, demand, and Micron's inventories, making Defendants' assurances material, *not* puffery. *Third*, Defendants failed to disclose information undercutting their opinions, thus those statements are actionable. *Fourth*, even if certain statements are considered forward-looking, they are actionable because they were accompanied by insufficient risk warnings. *Fifth*, Defendants' knowledge or reckless disregard of the truth and insider trading raises a strong inference of scienter.

### FACTUAL BACKGROUND

#### A.    Background of Micron and DRAM and NAND Semiconductor Chips.

Micron is in the business of manufacturing and selling DRAM and NAND chips. ¶31. DRAM stores information while a computer is operating, while NAND is used for long-term storage and retrieval. ¶¶33-34. Micron reaped $4.21 billion in NAND sales and $10.98 billion DRAM sales in FY23,[2] and $7.23 billion in NAND sales and $17.60 billion in DRAM sales in FY24. ¶36, constituting 97.7% of revenues in FY23 and 98.9% of revenues in FY24. ¶36. Production of NAND and DRAM chips requires unusually long lead times, thus not only must Defendants make production decisions a year in advance based on anticipated market demand (¶¶44-46, 50), but Micron is always at risk of lacking inventory to meet demand or holding excess inventory because of a sudden demand decline. ¶37. The risk of excess inventory is especially acute because Defendants cannot easily adjust production rates. ¶48.

Given these risks, Defendants closely tracked customer demand and inventory. According to CW1,[3] Micron's former Finance Director for Technology Development, the

---

[2] Micron's fiscal year is "the 52 or 53-week period" ending the Thursday closest to August 31. ¶31 The Company's FY23 ended August 31, 2023 and FY24 ended August 29, 2024. *Id.*

[3] CW1 is referred to in the masculine to preserve anonymity.

Company's "quarterly forecast" and "budgeting" were "extremally detailed," and Micron executives "constantly track[ed]" for "materially significant changes" throughout financial quarters using an "accelerated SAP system" ("ASAP") for Enterprise Resource Planning, "Workday" software for forecasting, and a "Power BI" dashboard for performance and plan reporting. ¶¶30, 40. CW1 further stated that "the business units know what big customers are ordering," "have close communication with key customers," and any declines in sales would trigger a "frenzy." ¶40. CW1 also said "[s]o many executive level meetings" occurred "if sales revenue is not coming in on target" that were attended by upper management, business unit heads, and the head of sales. ¶41. CW1 further stated that Micron used a "Flash Report" to keep track of quarterly goals, which was created and maintained by "Financial Planning & Analysis." ¶41. The report was updated weekly, generated on Fridays, and specifically tracked Micron's NAND and DRAM sales and manufacturing data. ¶42. The report was for Murphy specifically but also went to Micron's executive group. ¶43. Micron also had insight into supply and demand for its products via its long-term agreements ("LTAs") with its customers. ¶61.

Micron's inventory risks also meant that its disclosures were essential to investors. ¶37. The Company's SEC filings disclosed cost of goods sold and dollar value of inventory, which investors could use to evaluate inventory management. ¶37. For example, investors could calculate Micron's "inventory turnover ratio" by dividing "cost of goods sold" by "average inventory." ¶38. A lower or declining inventory ratio can indicate weak sales or excess inventory, while a higher or increasing ratio can reflect strong sales or insufficient inventory. ¶38. Investors could also calculate "days in inventory," or the average number of days for Micron to sell off inventory, by diving average inventory by costs of goods sold and multiplying the quotient by a number of days, *e.g.*, 365 days if calculating an annualized ratio. ¶39. Lower days in inventory indicates efficient selling of inventory, while higher days in inventory suggests ineffective inventory management or difficulty selling inventory. ¶39.

4

### B.    Micron Suffers Severe Losses After an Unexpected Demand Decline

In the year prior to the Class Period, Micron experienced an unexpected decline in demand leading to excess inventories and massive losses, including a *$1.83 billion* inventory write-off in FY23. ¶37. Micron's 4Q22 revenue fell to $6.6 billion from $8.2 billion in 4Q21 and $8.6 billion in 3Q22. ¶53. Revenue declined to $3.7 billion in 3Q23, but Micron's cost of goods sold remained flat, which meant it lost money on each unit sold. ¶54. The demand slowdown also caused Micron's inventories to skyrocket from $6.6 billion to $8.4 billion from 4Q22 to 1Q23. ¶55. This was clearly unexpected because Micron's inventory turnover ratio fell from 3.02x to 2.42x, and its days in inventory ratio rose 25%, from 120 days to 150.6. ¶¶55-56. Micron also reduced the number of wafers it began manufacturing in 2023 and recognized hundreds of millions in costs from underutilization of facilities. ¶59.

### C.    After Months of Severe Decline, Defendants Suddenly Tout Micron's Future

Although Micron's stock declined for multiple financial quarters, Defendants abruptly began touting Micron's current business, as well as its prospects *over two years into the future*. On a March 28, 2023 earnings call, Mehrotra touted "*we remain confident in long-term demand*," "*we believe that the memory and storage TAM will grow to a new record in calendar 2025*," and "*'24 and '25 will be strong years that will drive strong growth*." ¶¶98, 100, 102. Mehrotra also touted that supply and demand for Micron products were aligned. ¶¶98, 104.

These claims were the tip of the iceberg. Over the next 13 months, Defendants consistently gave investors a rosy impression of supply-demand alignment for the chip market, increased demand for Micron products, and its future performance *through calendar year 2025*. For example, regarding demand, in September and October 2023 Defendants touted that "*[o]ngoing demand growth, customer inventory normalization, and industry-wide supply reductions have set the stage for increased revenue, along with improved pricing and profitability throughout fiscal 2024*." ¶¶114, 120 *see* ¶¶122, 124, 126, 132, 134, 136, 140, 147, 151. Similarly, in December 2023, Defendants touted "*improving demand growth driven in part by deployment of [AI], customer inventory normalization, and industry-wide supply discipline,*

5

*resulted in an improved industry supply and demand balance.*" ¶¶130, *see* ¶¶106 112, 108, 110, 114, 116, 118, 128, 134, 136 138, 149. Finally, Defendants touted Micron's prospects in **2025**—*i.e.*, because of the long lead times for chip production—including in December 2023 that "***we expect a healthy demand-supply environment in 2025 as well as a healthy pricing environment in '25 too,***" and in June 2024 that Micron is "***well positioned to deliver a substantial revenue record in fiscal 2025***" ¶¶102, 112, ¶128, 142; *see* ¶¶124, 144. When analysts questioned these statements, Mehrotra insisted demand would remain high. ¶¶146-47.

Defendants claims were rocket fuel for the Company's share price, which ***skyrocketed 158.9%***, from $59.28 per share at the start of the Class Period to $153.45 on June 18, 2024, and ended the Class Period at $103.90, up 75.3% from the start of the Class Period. ¶6.

### D.    Defendants' Touts Were Inconsistent with Statements from Industry Observers and Competitors and Developments in China

Mehrotra's confidence stood in stark contrast to statements from industry watchers and Micron's competitors, as well as looming competition from China. For example, on March 28, 2023—the day Defendants' misstatements commenced—TrendForce, a news outlet covering DRAM and NAND, predicted *declining* sales prices for DRAM "with No End in Sight." ¶63. Likewise, a Daiwa Capital Markets analyst told CNN on April 27, 2023, that the market was facing a deep downturn with only a gradual recovery at best. ¶63. Similarly, in October 2023, Hynix, a top competitor, said NAND "supply growth had continued leading to a sharp rise in inventory level and worsening profitability," and overall DRAM and NAND production growth would be positive in 2024, "but only by a single digit." ¶¶66-67. Later, in July 2024, Hynix said NAND demand generally "is still showing a modest recovery." ¶70. Other competitors, including Western Digital and Samsung echoed these sentiments. ¶¶69-71. The statements also were curiously optimistic given impending competition from China. ¶¶72-73, 78-81.

### E.    The Truth Emerges, Devastating Investors

Defendants' touting of Micron's business and prospects culminated in late September and early October 2024 when Mehrotra stated that Micron was **"*entering fiscal 2025 with the best***

*competitive positioning in Micron's history***," "***expect[ing] a healthy industry supply-demand environment for NAND in calendar 2025***," and "***exiting the year [FY2024] with excellent momentum and an industry-leading product portfolio***."** ¶164. Mehrotra said the Company was prepared for this increase by "***ramping production of the industry's most advanced technology nodes in both DRAM and NAND***." ¶157. This increased production was pivotal to investors, who understood that Micron would not risk excess inventory without orders in hand. ¶¶44-51. When questioned by analysts, Murphy reiterated that "***things are coming together as we had hoped, tied at the leading edge, good supply demand, favorable pricing environment***." ¶160.

Investors were stunned when, on December 18, 2024—only three months after Defendants' last misleading statements—Defendants disclosed that Micron NAND sales declined 5% in 1Q25 due to decreases in bit shipments average selling prices. ¶166. Defendants then reduced Micron's guidance for (i) adjusted earnings ***20-30%*** from $1.92 per share to $1.33 to $1.53; (ii) sales by ***approximately $1 billion*** from $8.99 billion to $7.7 to $8.1 billion; (iii) and adjusted gross margin from 41.3% to between 37.5% and 39.5%. ¶167. Defendants also stated that since "consumer-oriented markets are ***weaker*** in the near term," *i.e.*, the opposite of their Class Period assurances, Micron would produce ***fewer*** NAND chips, even though Mehrotra touted Micron had been "ramping production" to meet demand. ¶169. Finally, Mehrotra admitted Chinese competition would hurt Micron. ¶¶88, 171. Micron's stock price plummeted 16.18% on December 19, 2024, and analysts substantially lowered the stock's price targets. ¶¶172-79.

**F.      Defendants Knew of and Exploited the Market Downtown**

Although Defendants presented the declining demand, billion-dollar guidance reductions, slowing production, and competition from China as unforeseen, Micron's financial disclosures indicated that they had planned for these events. ¶89. For example, given the lead time for chip manufacturing, an unanticipated demand decline would cause massive inventory increases. ¶90. During the 2022 slowdown Micron's inventories shot up ***27.2% in one quarter,*** from $6.6 billion to $8.4 billion. At the time of the December 2024 decline, however, Micron's inventories remained essentially flat or declined, *i.e.*, ***improved***, which meant that Micron had not "ramped"

7

production at all. ¶¶91-92. In addition, the Company's inventory ratios, which had declined by 20-25% in the 2022 slowdown (¶56), did not materially change on an annualized basis, and on a quarterly basis actually improved (¶¶93-95). An expert retained by Plaintiffs confirmed that the data reflected anticipation of a demand decline and not "ramping" of production. *See* ¶¶96-97.

During the Class Period, Mehrotra had exploited his touts of Micron's business and prospects. Pre-Class Period, Mehrotra sold Micron stock *once*: 100,000 shares of stock on January 14, 2022 for $971,600. ¶¶82-83. On May 15, 2023, just after Defendants began touting Micron, Mehrotra adopted a 10b5-1 plan to aggressively liquidate his Micron holdings, under which he sold shares *46 times* between August 14, 2023, and June 18, 2024, selling 799,284 Micron shares for total proceeds of $77,471,537.52, an increase of *7,873.6%* over his pre-class period sales. ¶¶83-84. In all, Mehrotra reduced his Micron holdings during the class period by 43.9%. ¶87. Post-Class Period, Mehrotra has made *one* sale of 7,500 shares for $784,986. ¶86.

## ARGUMENT

Dismissal pursuant to Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable theory or sufficient facts to support a cognizable theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). Courts accept as true all factual allegations and draw all reasonable inferences in plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rts, Ltd.*, 551 U.S. 308, 322-23 (2007). Although Exchange Act claims are subject to a higher pleading standard under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure, courts should not "raise the bar of the PSLRA any higher than that which is required." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

The elements of a claim under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 are "(1) a material misrepresentation or omission … [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance…(5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). Defendants challenge falsity and scienter.

8

### A.    THE AC PLEADS ACTIONABLE MISSTATEMENTS

#### 1.    Defendants' Misleading Touting of Micron's Prospects Is Actionable

Statements are actionably misleading if they "give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). Whether a statement is misleading depends on "context and manner of presentation." *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Here, after the 2022 downturn devastated Micron's revenues, forcing Defendants to write off $1.83 billion in excess inventory, Defendants propped up Micron share price by assuring investors that demand for its products was recovering, supply and demand were aligning, and it was on track for FY25 revenues. ¶¶98-163. For example, Defendants' statements about performance 2025 performance, including "*'24 and '25 will be strong years that will drive strong growth*" (¶102), "*we expect a healthy demand-supply environment in 2025*" (¶128), Micron is "*well positioned to deliver a substantial revenue record in fiscal 2025*" (¶142), and "*[w]e are entering fiscal 2025 with the best competitive positioning in Micron's history*," misinformed investors that Defendants neither had evidence of declining demand nor were they limiting production in anticipation of declining demand. *See* ¶¶98, 100, 102, 112, 124, 128, 142, 144, 155, 159. Defendants' assurances that they were "*ramping production*," not maintaining or reducing production, in anticipation of demand reinforced this perception. *See* ¶157.

These statements were false because the long lead times for Micron products and the Company's flat or improving inventories (¶¶88-97) demonstrate that Defendants had planned for declining inventories and never "ramped" production. *See W. Pennsylvania Elec. Emps. Pension Fund v. Mentor Graphics Corp.*, 2017 WL 3668957, at *5, *31 (D. Or. June 2, 2017) ("long lead times" allowed company to know revenues quarters in advance), *report and recommendation adopted sub nom. W. Pennsylvania Elec. Fund v. Mentor Graphics Corp.*, 2017 WL 3622779 (D. Or. Aug. 23, 2017); *In re Peoplesoft, Inc.*, 2000 WL 1737936, at *3 (N.D. Cal. May 25, 2000) (company with "high visibility" based on a "long lead time" had "the ability to see the downturn before it was reported"). In addition, the fact that Defendants touted 2025 demand and revenues

(¶¶153-62) only three months before reducing guidance by $1 billion (¶¶164-71) is classic evidence that the statements were false when made. *See Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1097 (9th Cir. 2022) ("It is settled precedent that the passage of just a short period of time between executives' rosy statements about their company's prospects and a downturn in those prospects is 'circumstantial evidence' that the challenged statements 'were false when made"); *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1997) ("shortness of time is circumstantial evidence that the optimistic statements were false when made").

Similarly, Defendants' statements touting increasing demand (*see* ¶¶114, 120 122, 124, 126, 132, 134, 136, 140, 147, 151) and supply-demand alignment (*see* ¶¶106 112, 108, 110, 114, 116, 118, 128, 130, 134, 136 138, 149) were misleading because Defendants knew, but failed to disclose, that China's chip manufacturing programs were already affecting the market for Micron products (¶¶72-81), supply and demand were misaligned and demand was not strong for Micron productions based on information gleaned from long lead times (¶¶44-51) and close tracking of inventory and sales (¶¶38-43), and the lack of material movement in the Company's inventories and inventory ratios reflect Defendants' knowledge of facts contradicting their statements (¶¶89-97). *See Mentor*, 2017 WL 3668957, at *5, *31; *Peoplesoft*, 2000 WL 1737936, at *3.

Defendants' arguments that their statements were not misleading are unavailing. *First*, Defendants' principal defense to Plaintiffs' allegations of falsity—that Micron's quarterly revenue increased during the Class Period—misconstrues the SAC's allegations. *See* Mot. at 8-11. Plaintiffs do not allege that Micron's revenue statements were false, but rather that Defendants' statements (i) regarding demand for Micron products, and (ii) their assurances about supply-demand alignment were false because they knew, but did not disclose, Class Period declines in demand, supply-demand misalignment, and competition from China. *See* ¶¶106-51. Micron's performance in FY24 is a red herring because that performance was based on data and orders made a year prior to the Class Period, given that customers purchase products under year-long "Long Term Agreements" ¶61, and thus did not reflect current demand. Had Defendants' spoken truthfully, the market would have understood that a demand decline was occurring.

10

Defendants plainly planned for the decline, because their inventory value and ratios stayed flat even though Defendants were purportedly surprised by the decline. *See* ¶¶88-97. While Defendants insist that they warned of demand declines and competition from China (Mot at 11-12), these warnings were meaningless because they presented as hypothetical risks that had already materialized. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021).

*Second*, Defendants assert that their statements regarding "ramping production" are not misleading because they only referred to a subset of products and inventories did increase. Not only does this argument fail because requires the Court to improperly make a contested inference in Defendants' favor, *see Tellabs*, 551 U.S. at 322-23, and credit Defendants' self-serving reading of the statement, but it is contradicted by the AC's allegations. For example, even if Defendants ramped production of a subset of products, inventories would increase, but the Company's inventories declined between 4Q23 and 1Q24. ¶91. Defendants' contention is simply not credible because, when Micron had faced a billion-dollar write down in 2022, its inventories shot up ***27.2% in one quarter***. ¶55. Finally, Defendants use a year-over-year comparison to assert that inventories increased (Mot. at 12)—but a year-over-year increase is irrelevant because Defendants claimed to be ramping production between 4Q24 and 1Q25 and plainly did not. ¶91.

### 2.    Defendants' Misstatements Find No Refuge in Any Safe Harbor

The PSLRA's safe harbor does not protect Defendants' statements. Even where misstatements reference forecasts, mixing statements about "past or current facts" with forecasts does not "transform" them to forward-looking statements, *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017), and asserting that a "current trend will continue" does not "automatically immunize" a misrepresentation that the trend currently exists, *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 869 (W.D. Wash. 2022).[4] Here, Defendants addressed current

---

[4] In *Sigman*, plaintiffs "did not identify or explain" any non-forward-looking aspects of the statements, and their theory of the case was that the statements were misleading about "the *likelihood*" of a project being completed. *Sigman v. Nuscale Power Corp.*, 2025 WL 1455432, at *9 (D. Or. May 21, 2025) (citing *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1195 (9th Cir. 2021)). As

facts when they declared that "*[o]ngoing* demand growth and customer inventory normalization" would "set the stage" for increased revenue, ¶114, and "the demand trend will *continue*." ¶128; *see also* ¶¶102, 104, 108, 116, 120, 134, 136, 144, 155, 160.

Even if the statements are forward-looking, they are still actionable because they are unaccompanied by meaningful cautionary language. Defendants' warning identifies factors like "weak demand" that "may cause actual results" to differ but fails to disclose that Defendants were aware that insufficient demand already existed. Rowe Decl. Ex. 4 at 6, 21-22, 23, 28-29. Where Defendants are "aware of a significant likelihood that [a] risk will materialize," a warning of "a mere *possibility*" of the risk is not meaningful. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023). Defendants only cite warning language from the 2023 Form 10-K, which only applies to one statement Defendants claim is forward-looking. Mot. at 13-14 (citing Mot. Ex. 4); ¶ 120. Defendants waived any argument that other meaningful cautionary language existed for other statements. *Nathanson v. Polycom, Inc.*, 2015 WL 12964727, at *1 (N.D. Cal. Apr. 16, 2015) (arguments not raised in opening brief waived) (collecting cases). In addition, Defendants knew their statements were false via access to and regular review of detailed reports of data underlying demand. ¶¶40-43. In addition, that Mehrotra dumped massive amounts of shares *before* the allegedly "record revenue" and "improved profitability" he was promising to the market demonstrates Defendants' knowledge as well. ¶¶82-87, 153. This would have driven Micron's share price *higher*, thus had Mehrotra believed his touts, he would have waited to sell. And, despite claiming to "ramp[] production" in expectation of this improved demand, Micron's inventories were *declining*. ¶¶89-97.

### 3.    Defendants' Misrepresentations Were Not {uffery.

Defendants claim puffery by cherry-picking individual words like "improving," "improved," "healthy," and "strong" (*see* Mot. at 14), but even in statements with

---

*Jaeger* noted, misrepresenting a current trend is different from misleading about whether the trend makes reaching a goal more likely. *See Jaeger*, 644 F. Supp. 3d at 869 n.8.

"superlatives…often seen in 'puffing' statements," the court "must analyze the context" and the statement must be "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.". *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 967-68 (N.D. Cal. 2014). Here, Defendants' statements (¶¶102, 108, 112, 120, 124, 128-32, 140-42, 153-55, 157, 162) were made in the context of a $1.83 billion inventory write-off, and thus were essential to investors, who were trying to evaluate how likely favorable business conditions were to occur and who understood that Defendants' statements were informed by Defendants' access to non-public information regarding customer demand months or years into the future because of the long lead times for chip development. Under these circumstances, statements like Defendants' are actionable. *See Plumbers & Pipefitters Loc. Union No. 719 Pension Tr. Fund v. Dick's Sporting Goods, Inc.*, 2025 WL 2325122, at *5 (W.D. Pa. Aug. 12, 2025) ("[o]ur inventory is healthy and well-positioned" not puffery); *In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*, No. 2:23-CV-10619-HDV-SK, 2025 WL 714171, at *6 (C.D. Cal. Mar. 3, 2025) (in context, "we are well positioned for even stronger business growth" is not puffery because it is connected to specific statements that "favorable current conditions will continue"); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649-50 (E.D. Pa. 2015) (statement that demand was "solid," "strong," and "good" actionable).

Further, Mehrotra's description of Micron's technology as "the most advanced" is not why the statement that "Micron is ramping production" is misleading. *Compare* ¶¶157, 160 *with* Mot. at 14. Finally, Defendants' descriptions of "seeing that the customer inventories are improving," ¶104, describe other market forces, and thus are not puffery. *See Jaeger*, 644 F. Supp. 3d at 872 (no puffery where defendants "ignore[d] the rest of the verbiage" connecting "strong customer demand" to changes in purchasing and described "what 'we're still seeing'"); *see also* ¶¶98, 102, 108, 112, 124, 128, 130, 132, 140, 155, 160, 162.

### 4. Defendants' Misstatements Are Not Inactionable Opinions

Nor are Defendants' misrepresentations protected as nonactionable opinion. A fact is a "thing done or existing" or "an action," rather than a sentiment," which "in ordinary usage does

13

not imply definiteness or certainty." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). Defendants asserted with certainty that there was "[o]ngoing demand growth [and] customer inventory normalization." ¶114; *see also* ¶¶98, 102, 104, 108, 110, 116, 120, 128, 130, 132, 134, 136, 138, 147, 151, 155, 160, 162.

Regardless, if Defendants' misstatements are opinions, they are still actionable. Opinions are actionable where (1) the speaker did not believe the opinion, (2) the opinion embeds false statements of fact, or (3) the opinion omitted details that created a misimpression about the basis of the opinion. *Omnicare, Inc. v. Laborers Dis. Council Constr. Indus. Pen. Fund*, 575 U.S. 175, 183-86, 188 (2015). All three circumstances exist here. *First*, Mehrotra's trading and Micron's inventory levels show that the Defendants did not believe the Company would experience "record revenues." ¶¶82-87, 153, *see also Section B, infra*. *Second*, these statements embed current facts about demand and inventory levels. *Third*, opinions about 2025 performance were couched in observations about the current "healthy" "supply-demand environment," the evidence showing that Micron was not in fact seeing increased demand "go to the basis" for these statements. ¶160; *see, e.g., Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 880 (N.D. Cal. 2023) ("Even if any statements about customer demand constitute opinions," the omitted contrary information "makes any opinion about such misleading").

## B.     THE AC PLEADS A STRONG INFERENCE OF SCIENTER

A strong inference of scienter exists if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. A "tie goes to the plaintiffs," *In re Dermtech, Inc. Sec. Litig.*, 2025 WL 1618193, at \*7 (S.D. Cal. June 5, 2025). The court considers "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation . . . meets that standard." *Tellabs*, 551 U.S. at 324. The inference "need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible,'" *id.*, and can be pled using circumstantial evidence. *See, e.g.*, *Quality*, 865 F.3d at 1146. Scienter can be alleged by

14

showing motive and opportunity or "evidence of reckless or deliberate behavior." *In re Networks Assocs., Inc. II Sec. Litig.,* 2003 WL 24051280, at *13 (N.D. Cal. Mar. 25, 2003).

### 1.    Defendants' Motive for Fraud

Mehrotra's trades evidence scienter because they were unusual and suspicious in timing and amount. On May 15, 2023, *after* he began touting Micron's strong 2024 and 2025 prospects, Mehrotra adopted a 10b5-1 plan structured so that his shares would be sold in 2024 at the height of the fraud, when the share price was inflated, and right *before* Micron was forced to admit to declining demand and reduced forecasts. ¶¶83, 86, 182. Mehrotra converted options for 799,284 shares for proceeds of over $77.4 million, with several of his largest sales (279,284 shares representing 17% of his total holdings) occurring when the stock was at or near its peak. ¶¶83, 85, 182. The AC alleges these trades were coordinated with Defendants' misleading statements, and thus suspicious in timing. *Compare* ¶84 *with* ¶¶112-122, ¶¶124-132, ¶¶134-40, ¶¶142-51; *see also* ¶85. It also pleads that they were suspicious in amount as compared to the pre-Class Period timeframe (proceeds of over $77.4 million versus $971,600) during which he sold Micron stock just *once* (compared to the *46* stock sales during the Class Period) and reduced holdings by 43.9%. ¶¶83-84, 87. This is powerful evidence of scienter. *See, e.g.*, *Dermtech*, 2025 WL 1618193, at *9 (sales of 22.1% of shares pursuant to a 10b5-1 plan and inconsistent with trading history); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharm., Inc.*, 2022 WL 4491093, at *13 (S.D. Cal. Sept. 27, 2022) (sales of $24,771,568 and $18,932,729 inconsistent with trading history and of which many were made pursuant to 10b5-1 trading plans adopted after the class period); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (sales of 2.1% and 7% of respective holdings and inconsistent with history); *Mulderrig v. Amyris, Inc.*, 492 F. Supp.3d 999, 1029-1030 (N.D. Cal. Oct. 5, 2020) (sales at or near class period highs and a "significant uptick" compared to only one pre-class period sale). Defendants' authority (Mot. at 19) does not hold otherwise. *Petersen v. Stem, Inc.*, 2024 WL 4602710, at *11 (N.D. Cal. Aug. 30, 2024) (no allegations of trades differing from prior practice and timing not suspicious); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094-96 (9th Cir. 2002) (sales by

15

non-speaking defendant of 74% of stock for $19 million suspicious in amount but not timing); *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) (non-speaking defendant sold 74% of holdings and no involvement with company operations).

Defendants cannot diminish the power of these allegations. *See* Mot. at 18-20. *First*, Murphy's lack of alleged stock sales ***does not*** negate scienter. *See Azar v. Yelp, Inc.*, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018) (finding defendant's stock sales support an inference of scienter where no other defendant was alleged to have sold stock). Defendants' cases (Mot. at 18) are distinguishable. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) (stock sales by two defendants were consistent with prior trading patterns and largely prior to an allegedly concealed detrimental investigation thus lack of sales by third defendant suggested no insider information from which to benefit); *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) (sales did not support scienter where only one defendant's sales were suspiciously timed, and none were historically inconsistent).

*Second*, Mehrotra's use of a Rule 10b5-1 plan is of no moment on a motion to dismiss. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009) (scienter pled "although evidence of the nondiscretionary nature of Defendants' sales may ultimately provide the basis of an affirmative defense at a later stage of the litigation, it suffices that, at the pleading stage, Plaintiffs have alleged significant and suspiciously timed securities sales"). Regardless, the plan does not undercut the AC's allegations given that it was adopted *after* the start of the Class Period when Mehrotra knew of material non-public adverse facts, the suspicious timing of plan sales vis-à-vis alleged misstatements and corrective disclosures, the amount of sales, and the inconsistency of the plan with his trading history. *See In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022) (nondiscretionary and pre-planned stock sales inconsistent with pre-class period trading support scienter); *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 885-886 (N.D. Cal. Apr. 18, 2023) (same); *Dermtech*, 2025 WL 1618193, at *9 (sales pursuant to 10b5-1 plan adopted after misstatement suspicious); *Acadia Pharm.*, 2022 WL 4491093, at *13 (sales made pursuant to 10b5-1 plans adopted during the class period support

16

scienter). *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.,* 2019 WL 2360942, at \*6 (S.D.N.Y. Mar. 4, 2019) (retaining some stock to soften losses without drawing attention to stock sales did not contradict fact that stock sales pursuant to trading plan were unusual). In addition, Mehrotra set his trading plan to sell stock in small batches over a long time, suggesting intent to avoid drawing attention to his sales. *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.,* 2019 WL 2360942, at \*6 (S.D.N.Y. Mar. 4, 2019) (retaining some stock to soften losses without drawing attention to stock sales did not contradict fact that stock sales pursuant to trading plan were unusual).

*Third*, Defendants are incorrect that sales must occur at a Class-Period high to support scienter. *See, e.g.*, *In re Daou Sys., Inc.*, 411 F.3d 1006, 1024 (9th Cir. 2005) (suspicious sales not at class period peak price contributed to strong scienter inference).

### 2.     Knowledge and Recklessness Allegations Strongly Evidence Scienter

Further supporting scienter is the fact that, in announcing its Q1 2025 results, Micron's inventory levels did not materially change, and Micron did not write down any inventory due to discounting, which is inconsistent with an unforeseen decline in demand. ¶¶90-94, 184, 187. Given the long lead times for chip development (¶¶44-48), Micron makes production decisions of upwards of a year in advance of anticipated demand (¶¶48, 50), and thus Defendants knew of and planned for the decline (¶¶184, 187). Indeed, while Micron announced in September 2024 that it was "***ramping***" production, which would have caused inventories to swell in response to less than anticipated demand (¶90), its inventories ***declined*** (¶¶58, 92). As Plaintiffs' expert opined, Micron's inventory disclosures throughout fiscal year 2024 and the first quarter of FY25 were either flat or lower and the relatively slight changes in these numbers strongly suggest advanced planning for reduced demand. ¶¶57-58, 184.[5] This result is opposite of what occurred

---

[5] Contrary to the Motion (Mot. at 17-18), courts routinely rely on expert analyses in pleadings as long as the "complaint describes the witnesses with sufficient particularity to establish they were in a position to know [about what they opine]"), *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004), which the AC does (*see* ¶58). *E. Ohman J. v. NVIDIA Corp.*, 81 F. 4th 918, 930-32 (9th Cir. 2022) (Mot. at 17), does not counsel otherwise as

in 2022, when the Company genuinely was surprised by an industry-wide demand decline, wrote off $1.83 billion in inventory, inventory levels exploded, and inventory ratios worsened. ¶184.

Further showing scienter is the fact that internal reports communicated sales, supply, and demand metrics to Defendants, who were focused on these issues. Contrary to the Motion, at 16-17, CW1 stated that Micron executives "were constantly tracking" "extremely detailed" "quarterly forecast" and "budgeting," through use of databases such as the ASAP (¶40); there were "many executive level meetings" "multiple times a week" to discuss sales targets and manufacturing deliverables (¶41); and that Micron uses a "Flash Report" "updated weekly" "***specifically for the CFO, i.e., Murphy***," but seen by "***everyone***" "including high level executives" to "keep track of the Company's quarterly goals" and "detailed forecasts, sales and performance of NAND and DRAM products" and "thus communicated to Mehrotra and Murphy the status of demand, sales, and inventory" belying Defendants' Class Period statements. ¶¶42, 186. This provides the requisite specificity as to the metrics Defendants tracked, reviewed, and discussed in regular meetings, including the contents of Flash Reports. *Tadros v. Celladon Corp.*, 2016 WL 5870002 at *13 (S.D. Cal. Oct. 7, 2016) (details of access to information show scienter); *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) ("In light of the company's ability to track its inventory, it is plausible to infer that Defendants knew [inventory] would be insufficient"). Requiring more is the sort of "smoking gun" that *Tellabs*, 551 U.S. at 324, disavowed. By contrast, Defendants' cases all rejected allegations about defendants' access to untitled reports, contents of which were only generally described, if at all. *E.g.*, *Police Ret. Sys of St. Louis. v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1056 (9th Cir. 2014) ("reports on [company's] business operations and business goals"); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-1036 (9th Cir. Mar. 20, 2022) ("internal reports on sales data"); *In re Aspeon, Inc. Sec. Litig.*, 168 F. App'x. 836, 839 (9th Cir. 2006) ("weekly reports").

---

it does not require an expert's methodology or detailed analysis. *Salzman v. ImmunityBio, Inc.,* 753 F. Supp. 3d 1050, 1066 (S.D. Cal. 2024), and *In re Nektar Therapeutics Sec. Litig.*, 34 F. 4th 828, 837 (9th Cir. 2022) involve conclusory and unexplained reasoning, unlike the AC.

CW1's allegations should be credited. The AC provides employment details including job title, tenure, supervisors, and responsibilities (¶30), and its substantive allegations (¶¶40-43) details his observations and the basis upon which the CW makes the statements. *Quality*, 865 F.3d at 1145. In addition, while CW1 left Micron before the end of the Class Period, (Mot. at 16), courts routinely credit CWs who left companies *before the start* of class periods, and CW1 speaks directly to what Defendants knew during the Class Period (¶¶40-43). *See Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at \*7 (C.D. Cal. Apr. 12, 2016) (crediting CWs who departed before the class period). Nor is it necessary for CW1 to have had direct contact with a defendant. *Compare* Mot. at 16 *with Quality*, 865 F.3d at 1138-39 (low-level employee accounts weighed in favor of scienter); *In re Countrywide,* 554 F. Supp. 2d at 1044, 1058-1059 (C.D. Cal. May 14, 2008) (scienter sufficiently pled based on CW statements, including low-level employees).

The inference of Defendants' scienter is further bolstered by (i) their repeated discussion of the precise issues implicated by the fraud, *e.g.*, ¶¶100, 102, 120, 136, 149, 157, 183. *See Quality*, 865 F.3d at 1145 ("[Defendants] repeatedly described the state of [company's] sales pipeline to analysts and investors"), (ii) their misleading responses to analysts' questions (*see* ¶¶146-47), *In re Fibrogen, Inc.*, 2022 WL 2793032, at \*24 (N.D. Cal. July 15, 2022) (answers to analysts' questions about topic at issue sufficient to allege scienter). *Institutional Inv'rs Grp v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("The most powerful evidence of scienter includes misleading response[s] to repeated questions by analysts"), and (iii) the magnitude of the billion-dollar guidance writedown. *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ("the magnitude of defendant's post-class period write-off," can with other factual allegations, "constitute[] sufficient pleadings as to recklessness").

### 3.    The Core Operations Doctrine Bolsters the Scienter Inference

Over 97% of Micron revenues came from NAND and DRAM chips (¶36). Defendants were directly involved in Micron's day-to-day operations, received internal reports regarding sales, supply, and demand, met multiple times per week to discuss them, and spoke repeatedly to investors about them. *See, e.g.,* ¶¶25, 41-43, 100, 102, 120, 136, 149, 157, 183. These allegations

19

support scienter. *See, e.g.*, *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008); *Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d 1226, 1232-34 (9th Cir. 2004).

### 4.      A Holistic Analysis Supports an Inference of Defendants' Scienter

Scienter must be considered holistically, and any competing inference must be ***more*** compelling than the inference alleged. *See Tellabs*, 551 U.S. at 326. Holistically, the following shows a strong inference of scienter: (i) Defendants repeatedly assured investors that demand was recovering and Micron was on track for record revenues in FY25, (ii) Defendants reassured investors that they had considered competitive pressures, including from China, (iii) Mehrotra structured a trading plan to sell a massive amount of stock at the height of the fraud, before the promised record year of 2025, and inconsistent with prior trading (iv) immediately after his windfall, Mehrotra disclosed revenue declines and reduced guidance citing customer demand levels and competition by YMTC, (v) Defendants already knew planned for a demand decline, and (g) the core operations doctrine. *See In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *1, *4-*7, *12-*14 (D.N.J. Dec. 6, 2018). Defendants' inference of "honest optimism" (Mot. at 20) is not more compelling given Mehrotra's over $77.4 million in profits from suspicious trades and Defendants' clear anticipation of a downturn.[6]

### CONCLUSION

For the above reasons, the Motion should be denied.[7] If the Motion is granted in any way, Plaintiffs respectfully request leave to amend, which should be given freely. *See Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

DATED: September 2, 2025                    **POMERANTZ LLP**

                                            */s/ Brian Calandra*
                                            Brian Calandra (*admitted pro hac vice*)

---

[6] Defendants point to a Micron stock repurchase that is neither pleaded nor can the Court "verify the circumstances surrounding the purchase of the stock," thus the Court must disregard the information. *Maiman v. Talbott*, 2010 WL 11421950, at *7 (C.D. Cal. Aug. 9, 2010).

[7] Plaintiffs allege securities law violations, and thus state Section 20(a) claims as to Mehrotra and Murphy. *See Glazer*, 63 F.4th at 781.

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
bcalandra@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Jonathan Stern (*admitted pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
jstern@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**RAMSDEN, MARFICE, EALY & DE SMET, LLP**
700 Northwest Blvd.
P.O. Box 1336
Coeur d'Alene, ID 83816-1336
Telephone: (208) 664-5818
Facsimile: (208) 664-5884
Marcus E. Johnson, ISB #10350
mjohnson@rmedlaw.com
Michael E. Ramsden, ISB #2368
mramsden@rmedlaw.com

*Liaison Counsel for Lead Plaintiffs and the Class*

**MILLER SHAH LLP**
Jayne A Goldstein *(pro hac vice forthcoming)*
1640 Town Center Circle, Suite 216
Weston, FL 33326
(954) 515-0123
Email: jgoldstein@sfmslaw.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton *(pro hac vice forthcoming)*
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

21

Email: aapton@zlk.com

*Additional Counsel for Lead Plaintiffs*

22

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2025, I served a true and correct copy of the foregoing on counsel of record via the United States District Court for the District of Idaho's CM/ECF system.

By: /s/ *Brian Calandra*
Brian Calandra